Decided 26 June, 1906.

**STATE v. BARNES.**

85 Pac. 998.

HOMICIDE—EVIDENCE OF CORPUS DELICTI.

1. In a prosecution for homicide the evidence as to the corpus delicti must show that the accused unlawfully caused the death of a particular human being,. and the proof may be sufficient, though entirely circumstantial.

HOMICIDE—IDENTIFICATION OF BODY.

2. In cases of homicide it is not always possible to positively and directly identify the body of the deceased, as, where it has been substantially destroyed, and in such cases the jury must determine the question of identity from the evidence presented.

CRIMINAL LAW—REMOTENESS OF EVIDENCE.

3. The finding of property of deceased concealed in the possession of defendant, though as long as six weeks after the death of the owner, is competent to be presented to the jury, and is not too remote.

CRIMINAL LAW—EVIDENCE OF ATTEMPTED ESCAPE.

4. In a criminal case it is competent to prove that the defendant attempted to escape from confinement after being arrested, subject to such explanation as may be offered.

From Douglas : LAWRENCE T. HARRIS, Judge.

John C. Barnes, having been convicted of murder and sentenced to be hanged, prosecutes this appeal.

AFFIRMED.

For appellant there was a brief over the names of *J. A. Buchanan, J. E. Sawyers* and *Cardwell & Watson*, with an oral argument by *Mr. William Wilshire Cardwell* and *Mr. John Andrew Buchanan.*

For the State there was a brief over the names of *A. M. Crawford*, Attorney General, *George M Brown*, District. Attorney, and *J. M. Williams*, with an oral argument by *Mr. Brown.*

MR. JUSTICE MOORE delivered the opinion of the court.

The defendant, John C. Barnes, was indicted, tried, and convicted of the crime of murder in the first degree, al-

leged to have been committed in Douglas County April 28, 1905, by killing one William Graham, in some way and manner, and by some means, instruments and weapons to the grand jury unknown. He appeals from the judgment of death which followed, and his counsel contend that the court erred in refusing to instruct the jury, as requested, to return a verdict of not guilty, on the ground that the evidence, which is wholly circumstantial, is insufficient to warrant a conviction.

The entire testimony given at the trial is sent up with the bill of exceptions, from which it appears that on Monday, May 1, 1905, at about 10 o'clock in the forenoon, a human skeleton was discovered in a burning log heap a few feet east of the right of way fence near the railroad, about a mile and a quarter north of Glendale. Nearly all the flesh had been consumed, and there remained of the framework intact only the skull, the vertebræ, and parts of the shoulder and of the hip bones. The structure of the skeleton indicated the death of a small person, but it was impossible to distinguish the sex. A soft black hat, having two matches stuck in the band, was found at the same time, hidden beneath the loose bark of a stump near the fire. There were also discovered in the ashes about where the hips of the skeleton lay, a three-bladed pocket knife, and near it some nails that had probably been driven in the soles and heels of the shoes worn by the deceased. In the immediate vicinity were seen some dark spots on the grass, earth, and stones, supposed to be blood stains, and the grass appeared to be lodged, as if some object had been dragged over it. After quite a number of persons had visited the place where the skeleton was found, a leather belt and a purse were discovered in the brush about 40 feet from where the fire had been. It further appeared that Graham, the man charged to have been killed, was

47 OR.——38

about five feet, four inches in height, weighed about 140 pounds, usually had matches in his hat band, and always carried a large Colt's revolver in a holster made from a boot top and suspended by a leather belt. Notwithstanding the fiber part of the handle of the knife had been burned, George Wood, as a witness for the State, claimed to recognize it as Graham's property, saying he had given it to him. The hat was claimed to be identified as Graham's by S. H. Duley, who testified that he had seen him wear it. Jesse Clements testified that the belt found in the brush was the one worn by Graham by which his revolver was carried, and which the witness recognized by the clasp of the girdle being loose.

The testimony tending to connect the defendant with the commission of the crime shows that he and Graham were gold miners who were acquainted with, and had lived near, each other on Dadd's Creek, Douglas County, for several months until Thursday, April 27, 1905, when Graham moved across Cow Creek to Tuller's Creek, several miles westerly, and was last seen as he crossed the railroad going to his new residence. The defendant on the next day borrowed a Winchester rifle from a neighbor, telling him that he desired to shoot a wounded deer which he had seen. That evening, as he returned with the gun, he found two men at his cabin who had been hunting for stray cattle, to whom he stated that Graham claimed to be a "bad man," and referring to the latter he remarked: "If he makes a crooked move at me, I will kill him." He further stated to his visitors that they need not arise when he did the next morning, for he was obliged to get up early so as to meet a man at a tunnel on the railroad. Barnes left his cabin Saturday morning about 4 o'clock, taking the rifle with him, and five hours thereafter he was in the town of Glendale, 10 miles southerly, where he paid a bill which he owed a merchant, and received a sum of money in ex-

change for a piece of cast gold that had been molded by and belonged to Graham, the identity of which was unquestionably established. The defendant left that town soon thereafter, and was seen at several points as he walked northerly along the railroad to a section house near his home, where he secured his supper. He returned to Glendale that night and became intoxicated, leaving two packages in the saloon where he had been imbibing. The next day, Sunday, April 30th, he was seen on the railroad carrying a Winchester rifle, and, meeting a man who appeared as a witness at the trial herein, he told him he had been hunting, describing the route he claimed to have traveled. Barnes returned the rifle that day and paid the man from whom he borrowed it 10 cents for the cartridges he had used. About noon that day the defendant engaged one G. L. Hittsman to help him carry some provisions that had come by rail up a hill towards his cabin, and as they halted for a moment's rest, Barnes, unwrapping a package, exhibited a revolver, whereupon his companion, referring to Graham, said, "You have got Bill's gun," and the defendant replied, "Oh! yes; I bought it from Bill."

Sunday evening Barnes went south on the train towards Glendale. The next morning, May 1, 1905, which will be remembered as the day when the skeleton was found, he called at a saloon in that town about 5 o'clock and, waking the barkeeper, he secured a drink of whisky. At 1 o'clock that day he was about a mile and a quarter north of Glendale, where he met one W. H. Pruett, to whom he stated that Graham had gone to Mule Creek, a tributary of the Umpqua River, prospecting, and that he had purchased from him some sluice boxes and was going to his cabin after them. Pruett told him the boxes referred to never belonged to Graham, but had been owned by another person from whom the narrator purchased them. Barnes, upon receiving this information, remarked: "I am so

damned tired and sore that I won't go any further. When you see Bill (meaning Graham), tell him that I got this far with you and turned around and went back." Whereupon he departed. The defendant on Tuesday night told a hotel keeper at Glendale that Graham, possessing a few dollars, had gone to California, and, referring to the nails discovered in the ashes, he further said if Graham was found he would have on old rubber boots. The sheriff of Douglas County, on Friday, May 5, 1905, visited Graham's cabin, which was locked ; but, opening it, he found the bed in order, some wearing apparel, provisions, dough mixed for bread, water left in pails, and two pairs of rubber boots. The following Sunday Barnes was apprehended at his cabin, underneath which there was then found wrapped in a gunny sack a pistol that was identified as Graham's, and referring thereto the defendant, though claiming to have owned the gun several years, said to the sheriff and to the men accompanying him : "I put the revolver there, and I did not expect you fellows to find it." At the time the arrest was made, the defendant's cabin was searched, and in emptying a sack of potatoes a chunk of tinfoil rolled out and fell to the floor ; but, without any examination, it was picked up and placed with the potatoes in the sack which had contained them. The sheriff, about May 31, 1905, took the defendant's goods and provisions from his cabin to the house of a neighbor, who, taking potatoes from a sack which had been so brought to him, saw a piece of tinfoil which he swept with the dust into a fireplace, where it remained until the 17th of the next month when, concluding to make solder of the foil, he picked it up and unrolled it, discovering inwrapped therein a diamond ring that had belonged to and been worn by Graham. The defendant gave no testimony at his trial and called only two hardware dealers, who as witnesses severally testified that the knife, the parts of which were found in the ashes,

and the revolver that was discovered beneath Barnes' cabin were generally kept and sold by merchants engaged in their trade. It also appeared that while the defendant was incarcerated in jail awaiting trial on the charge of which he was convicted, he attempted to escape.

1. It is argued by defendant's counsel that the evidence hereinbefore detailed, which we deem a fair statement of that given at the trial, is insufficient to establish either the death of William Graham, the person charged to have been killed, or the criminal agency of the defendant. In *State* v. *Williams*, 46 Or. 287 (80 Pac. 655), it was held that circumstantial evidence alone was sufficient to prove the death of the person alleged to have been killed ' and also the criminal agency of the party accused of the commission of the offense. In that case the person charged to have been killed was last seen in the presence of the defendant in that action, and there were found in what was supposed to have been a temporary grave gunny sacks that had been saturated with a liquid which by chemical analysis, was claimed to have been human blood, and also a lock of a woman's hair which was recognized as that of his alleged victim. The evidence necessary to establish the corpus delicti in cases of homicide must show (1) that the life of a human being has been taken, which question involves the subordinate inquiry as to the identity of the person charged to have been killed ; and (2) that the death was unlawfully caused by the party accused thereof, and by no other person. In *Campbell* v. *People*, 159 Ill. 9 (42 N. E. 123, 50 Am. St. Rep. 134), it was held that the corpus delicti might be proved in a prosecution for murder by circumstantial evidence where that was the best proof obtainable; but that great caution should be observed in acting upon it.

2. Reviewing the evidence introduced in the case at bar, to prove the first element stated, Dr. W. H. Dale, a

licensed practicing physician, and a graduate of a reputable
medical college, who was a witness at the coroner's inquest,
testified that he was positive the skeleton found in the
burning log heap was the remains of a human being. As
to the identity of the remains, it is not necessary that the
evidence should be direct and positive, where such proof
is impracticable: Wills, Cir. Ev. (6 Am. ed.), 213; *Taylor*
v. *State*, 35 Tex. 97. Thus in *Rex* v. *Clewes*, 4 Car. & P.
221, a carpenter's rule and the remains of a pair of shoes
found near a skeleton were in part the means used to
identify the relics of a man who had been buried 23 years.
In *Commonwealth* v. *Webster*, 5 Cush. (Mass.) 295 (52 Am.
Dec. 711), the metallic teeth of a person found in a fur-
nace were held sufficient to prove the identity of a person
charged to have been killed. In *State* v. *Williams*, 7 Jones
(N. C.), 446 (78 Am. Dec. 248), the charred remains of a
missing woman were identified by the finding of certain
hair pins with the bones and proof that the deceased was
in the habit of wearing such pins two or three years prior
thereto. In *Jackson* v. *State*, 29 Tex. App. 458 (16 S. W.
247), the identity of a child was proven by finding a num-
ber of small bones, locks of short curly black hair, and a
small calico bonnet. So, too, in *State* v. *Martin*, 47 S. C. 67
(25 S. E. 113), the identity of the charred remains of a per-
son was established by finding in the ashes with the skele-
ton a piece of burned cloth like the woven fabric of which
his trousers were made, and which he wore at the time of
his disappearance, and by discovering in the same place
a slate pencil with certain indentations thereon. In the
case at bar the witness George Wood, referring to the knife
found in the ashes, in answer to the direction: "Tell the
jury why you know the knife," said: "I know the knife
by the shape, the make and by the defects in it. The knife
was always loose in the springs here and hard to open.
That is the reason that I gave it to Graham."

It is argued by defendant's counsel that, the fire having consumed a part of the handle of the knife, the heat was sufficiently intense to injure the springs, and, this being so, the witness could not recognize the instrument, which was commonly sold by hardware dealers, and hence the skeleton was not identified as the remains of Graham. The testimony so given by Wood was competent and its adequacy was a question which the jury were called upon to determine: *Udderzook* v. *Commonwealth*, 76 Pa. 340. The hat which was found beneath the loose bark of an old stump near the fire, at the time the skeleton was taken from the ashes, was identified as the head covering worn by Graham, whose habit it was to carry matches stuck in his hat band. The finding of two matches so placed in the hat referred to affords corroborative evidence of the identity of the person who carried them in this peculiar manner. So, too, the finding of the belt in the brush, though not discovered until several days after the fire, was identified as Graham's girdle. The finding near the remains of a human being of property that is recognized as having belonged to a missing person is a circumstance tending to identify the body of the deceased. It is possible, however, that such property may have been purposely placed by its owner where it was found to induce the belief that a living person is in fact dead, or that such personal chattels were intentionally put in the place indicated to create an inference of the identity of the deceased where doubt on that subject exists. The degree of proof resulting from such discovery necessarily depends upon the opportunity which time and interest afford a designing person to manufacture evidence. The finding of the belt, several days after the inquest was held, when there had been time and chance to create an inference of the identity of the deceased, weakens the evidence which the circumstance of the discovery would ordinarily produce, if seasonably made. Such evi-

dence was admissible and it will be presumed, in the absence of any showing to the contrary, that the court correctly instructed the jury, as to the degree of proof which the circumstances adverted to furnished..

It will be remembered that the parts of the skeleton found in the burning log heap, indicated the remains of a small person. This fact alone is not controlling on the question of identity, for the human framework discovered might have been that of any person corresponding in stature with Graham (*Commonwealth* v. *Webster*, 5 Cush. 295, 52 Am. Dec. 711), but when this circumstance is considered in connection with the other attending conditions, we think the jury were authorized in concluding as the verdict implies, that the remains were those of the person charged to have been killed. The consumption of a human body by fire does not necessarily repel an inference of suicide or of an unintentional death, for the dissolution may have been caused by purposely leaping or accidently falling into a fire, or by being unable to escape from a burning building. So, too, a human body may be destroyed by that means after death had resulted from natural causes. The finding of the remains of a healthy person, like Graham, in a burning log heap, where escape was possible in case contact with the fire was accidental, and probably, where immediate intense pain resulting from the flame would cause an abandonment of an attempt at self-destruction, must necessarily repel every inference of death by means of such a fire. This conclusion is fortified by the testimony of a locomotive fireman who said that on Monday, May 1, 1905, at about 2:20 A. M., he saw, on the east of the railroad, about a mile and a quarter north of Glendale, a fire and a man standing by it. From this declaration under oath it would seem to appear that the fire which consumed Graham's body was not ignited by him. The evidence of what was supposed to have been blood stains in the vicin-

ity of the ashes, and the appearance of the grass and weeds indicating that some object had been dragged towards the fire, thereby lodging the vegetation and staining the right of way fence with blood, warranted the jury in concluding that Graham's death did not result from natural causes or from suicide.

3. This brings us to a consideration of that branch of the question which involves the criminal agency. It will be remembered that on Saturday, April 29, 1905, at about 9 o'clock in the morning, the defendant paid a bill which he owed a merchant in Glendale by giving a piece of gold that had belonged to Graham. The next day Barnes exhibited a revolver to the witness Hittsman, saying he had purchased it from Graham, which gun was found when the defendant was arrested hidden beneath his cabin. At the time the revolver was found there was also seen in a sack of potatoes in Barnes' cabin a piece of tinfoil. When these potatoes were taken to a neighbor's house and emptied, there dropped from the sack a piece of tinfoil, which being thereafter unrolled, a diamond ring was discovered that had belonged to Graham. In *Williams* v. *Commonwealth*, 29 Pa. 102, it was held that an instruction directing the jury to infer the commission of the crime of murder from the possession of stolen articles, where the evidence was adequate to warrant a conviction of the latter crime, correctly stated the law applicable to the facts involved. In deciding that case, Mr. Justice PORTER, comparing the instruction referred to with another that had been given, says: "In that portion of the charge which treats of the possession of the coin, and the right of the jury to infer a higher crime from the possession of stolen articles, sufficient to convict the defendant of larceny, we see as little to condemn. If criminal offenses are to be punished, circumstances like these must be laid hold of to prove them." In *Poe* v. *State*, 10 Lea (Tenn.), 673, a similar instruction was

given at the trial of the plaintiffs in error, who were charged
with the commission of the crime of murder in the first
degree, and it was held that no error was committed, the
court saying: "In fact, the recent possession of stolen ar-
ticles under these circumstances would not merely be a
strong circumstance, but raise a presumption of guilt,
upon which the jury should convict." So, too, in *State* v.
*Anderson*, 10 Or. 448, a pocket book containing money that
had belonged to a person alleged to have been killed hav-
ing been found in the possession of the defendant was con-
sidered as tending to establish his criminal agency.

An exception was taken by defendant's counsel to the
admission of testimony as to the finding of Graham's dia-
mond ring, on the ground that the circumstance was too
remote, indefinite and uncertain. In *Morris* v. *State*, 30
Tex. App. 95 (16 S. W. 757), testimony of the finding in a
well of a watch, the property of a person charged to have
been killed, several months after the alleged murder, was
held admissible in connection with other evidence proving
that on the day the defendant was arrested he had access
to the well and could have thrown the watch into it. It
will be remembered that on the day Barnes was arrested
there was found in his sack of potatoes a small roll of tin-
foil, the identity of which was reasonably accounted for,
which being unwrapped revealed Graham's diamond ring.
Evidence of this circumstance in connection with the
others was, in our opinion, admissible. In the case of *State*
v. *Anderson*, 10 Or. 448, the defendant's contradictory state-
ments as to the whereabouts of the missing person were
also regarded as tending to create an inference of his guilt.
In the case at bar Barnes stated that Graham had gone to
Mule Creek prospecting and afterward that he had gone
to California, saying that Graham had a few dollars, thereby
implying that he was able to travel by rail. As Mule Creek
is situated west of Glendale and California south of that

town, it was possible for a person going to the former place to continue his journey to the sister State ; but as the travel by rail is so much easier and speedier than journeying over the mountains, the defendant's declarations should be considered as tending to incriminate him : *State* v. *Reed*, 60 Me. 550.

4. The defendant having attempted to escape from the jail in which he was confined, awaiting trial on the charge of which he was convicted, is also a circumstance slightly tending to prove his guilt. Circumstantial evidence is legal and competent in the gravest kind of criminal cases ; and if it is of such a character as to exclude every reasonable hypothesis, other than that the party accused of the commission of the offense is guilty thereof, it is sufficient to authorize a conviction.

Believing that the attending circumstances adverted to are of the character indicated, and that other alleged errors that have been assigned are unimportant, the judgment is affirmed.                                        AFFIRMED.