STATE, RESPONDENT, v. HARRIS, APPELLANT.

(No. 5,204.)

(Submitted January 5, 1923. Decided January 31, 1923.)

[213 Pac. 211.]

*Criminal Law—Homicide—Evidence—Exhibits—Instructions— County Attorney—Misconduct During Trial.*

Homicide—Evidence—Exhibits—Proper Admission.

1. In a prosecution for homicide committed at a resort some distance from a city at which a number of people were "held up" and despoiled of their valuables, a watch taken from one of them and found three days after the shooting in an automobile in which the party of four who perpetrated the robbery and during which the decedent was killed were driven to and from the place, was properly admitted in evidence.

Same—Evidence—Sufficiency.

2. Evidence examined and *held* sufficient to justify the inference that defendant or one of his accomplices shot deceased in the perpetration of a robbery.

Same—Commission in Perpetration of Robbery—Murder in First Degree —Instructions.

3. Where a homicide is committed in the perpetration of a robbery, the killing is murder of the first degree, and therefore instructions defining the lesser degrees of murder need not be given.

Same—Circumstantial Evidence—Instructions.

4. Instructions on circumstantial evidence are proper only where the state relies exclusively on that class of testimony, hence where there is direct evidence of the *corpus delicti* such instructions are properly refused.

Same—Evidence—Tagged Exhibits—Nonprejudice.

5. Where exhibits in the shape of revolvers taken from defendant had tags attached to them showing that they were taken from his possession and that one of them had been used in the killing were lying on a table in front of counsel but not near enough to enable the jury to read the tags and the exhibits were not passed to the jury for inspection, the fact of their presence there could not have worked to the prejudice of defendant.

Same—Misconduct of Prosecuting Attorney.

6. *Held*, that the charge of misconduct by the prosecuting officers in causing a confession of one of defendant's accomplices to be published in the press and to be called to the attention of the jurors by newsboys while they were being conducted through the streets by the bailiff on their way to a restaurant was not borne out by the record.

*Appeals from District Court, Silver Bow County; Jeremiah J. Lynch, Judge.*

WILLIAM HARRIS, convicted of murder of the first degree, appeals from the judgment of conviction and from the order refusing him a new trial. Affirmed.

*Mr. F. E. Blodgett,* for Appellant, submitted a brief and argued the cause orally.

*Mr. Wellington D. Rankin,* Attorney General, and *Mr. L. A. Foot, Mr. George M. Bourquin,* County Attorney, and *Mr. Leslie B. Sulgrove,* Assistant County Attorney, for the State, submitted an original and a supplemental brief; *Mr. Foot* argued the cause orally.

MR. JUSTICE COOPER delivered the opinion of the court.

The defendant was tried in the district court of Silver Bow county and convicted of murder. He appeals from the judgment and an order denying a new trial.

Counsel insists that twenty-four errors were committed by the trial court in rulings against the defendant. The following questions are argued and presented: 1. Did the court err in admitting exhibits consisting of pistols, bullets, shells, clothing and other articles taken from the possession of defendant and his companions? 2. Did it err in giving certain instructions and refusing others? 3. Did the prosecuting attorney resort to artifice in getting extraneous matter before the jury? 4. Is the evidence sufficient to sustain the verdict?

Exhibit "E," to the introduction of which serious objection [1] is made, was an Elgin watch which belonged to Sabo, the witness who drove the Grant party to the scene of the homicide. It was taken from him by the person who rifled the pockets of the victims. The evidence of the finding given by Deputy Sheriff Curran is that on November 27, while the car was being used to convey persons to a funeral, he "pulled up the folding seat of the car and pushed it back again"; and after doing so he saw the watch on the floor of the car under the seat, as did also Mr. Bertoglio, one of its five occupants,

neither one of whom had occupied the seat in question; that until then the car had not been used from the time the defendants were conveyed in it to the county jail after their arrest. From this and the other evidence before them, the jury were at liberty to draw the inference that the defendant, or one of his accomplices, had dropped the watch upon the floor of the machine in order to prevent the officers from finding it upon him in a search at the county jail. (6 Ency. of Evidence, p. 694; *State* v. *Barnes*, 47 Or. 592, 7 L. R. A. (n. s.) 181, 85 Pac. 998; 16 C. J. 618, 619; *State* v. *Aspara*, 113 La. 940, 37 South. 883.)

Counsel next earnestly contends that there is no evidence [2] that the defendant, or any one of his companions in the robbery, did the killing, and that without substantial proof of that fact, the instructions given by the court defining murder of the first degree were unwarranted and the verdict of the jury without evidence to sustain it. If the evidence is not sufficient to justify the inference that Schilling was killed by one of the four defendants in the perpetration of the robbery, the court was not only in error in giving Instructions 12, 13, 14, 16, 18 and 22, but also in submitting the case to the jury at all.

The evidence, in substance, is this: Shortly after midnight of November 24, 1921, Frank Grant, Dan Grant, Alice Rovaro and Gladys Kelly, driven in a taxicab by Sabo, arrived at the roadhouse known as the Harrison Hotel, situated about a mile and a half from the business portion of the city of Butte. All of them except Dan Grant were witnesses and described the scene enacted in the barroom with much the same particularity. They all stated that while they were standing in front of the bar in the barroom, the door-bell rang and Mr. Schilling, the proprietor, left the room to answer it. Soon thereafter a man armed with a revolver stepped past the end of the bar and ordered them all to throw up their hands and turn their faces to the wall. They all obeyed except Dan Grant, who at first refused to obey the order, whereupon the

man who appeared to be in command of the enterprise said: "Put 'em up there, or I'll shoot you down one by one." This had the desired effect and he put up his hands and faced the wall as the other members of the party were then doing. Shortly thereafter someone was heard walking into the room and another person to say: "Line up with the rest of them." The man who first entered walked up and down the center of the room and continued to give directions until the "holdup" was completed. He told one man "to get to the door," to watch it and "shoot if anyone turned the knob." Another man he ordered to take the cash from the register and to make haste about it. After the contents of the cash register had been removed, the same man was ordered to search the persons who were facing the wall and to take whatever cash or valuables they might have upon them. While the robbery was in progress groans could be heard from the direction of the door the deceased had gone to open. Frank Grant, after describing the transaction as above set out, proceeded as follows: The man doing the searching then "stepped over to Mrs. Kelly at my left and started to take her ring. She was told to take the ring off her finger and she couldn't take it off. Somebody said, 'If you can't take the ring off, spit on it.' She said, 'No, I won't spit on it.' So then he said, 'Well, cut the finger and all off.' Q. Did you hear any remark that was said prior to that time repeated? A. Yes, sir. Q. Using the exact language, Mr. Grant, as near as you can? A. The exact language as it was quoted? Q. Yes. A. 'We have murdered a man' or 'we have committed murder and it would be no worse if we shoot the rest of you; it would be no worse for us if we shoot the rest of you.' " On cross-examination he testified: "First I heard someone shouting, 'Get back up there and don't let me hear that knob turn again,' or 'Get back up there and remain there and don't let me hear that knob turn again.' Then I heard someone coming into the room and someone said, 'Line up with the rest of them.' Next, as the fellow who was engineering the job rushed up and down the

floor a time or two, he rushed over to Dan Grant saying, 'Have you a gun?' And he said to someone else, 'Search Slim, there; he might have one too,' and I was searched for a gun then. At that time we were reminded that one man had been murdered or killed, and we could hear groaning to our back some place,—and it would be no worse for them if they killed the rest of us. At that time someone said, 'You get on the front door and shoot if anybody turns the knob.' Someone else was told to rifle the register which he started to do. Another man was told to start shaking us down. He started on Dan Grant first to my right. After searching him he stepped behind me, first searching in my vest pocket here, pulling out a ten dollar bill and a silver dollar, and pushed it back.''

Gladys Kelly's account of the occurrences in the barroom is as follows: ''There was a man taller than I am searching us, took all of our jewelry and money and my ring. I heard one man at the cash register; a man standing with a gun on us; he was talking continuously; a man at the cash register,—I could hear him taking the money out of the drawer, and there was also a man searching us at the same time. Q. What, if anything, did you hear these men say? A. Well, he talked continuously,—I couldn't repeat just what he said, word by word; but he talked to the gentleman at the register and told him to rifle the drawer and get every cent of it; told him to remove my ring, and I turned around and looked at him and said, 'I can't get it off.' I didn't do it because I was afraid and through excitement, and he said, 'Well, spit on it and take it off,' and I said, 'I can't do that,'—it fit very tight, and he said, 'There is those clippers'—no 'those pliers'; and the gentleman turned around, the taller one of the four, and took the pliers and cut my ring off and I was looking right into his face at the time he was cutting my ring off my finger. The little fellow I think to one side of me seen me looking at him, said, 'Face that wall,' and I did.'' Mrs. Kelly was confronted with the defendant at the office of the county attorney on the evening of their arrest and ·identified him as

the tall man who had cut the ring off her finger with a pair of pliers.

The evidence of Sabo, the taxi driver, was that instead of going into the barroom with the rest of the party he went into the parlor and sat down at a table in the center of the room and began to play solitaire; that almost immediately he heard the bell ring and Schilling going to the north door to answer it. After opening the door, the witness heard the shuffling of .feet and Schilling "holler out, 'For God's sake, don't shoot.'" Following that was a shot and something was heard to fall. While still sitting at the parlor table, a few moments later a man appeared at the door, pointed a gun at his head and ordered him to go into the barroom with his hands up and take his place along the wall with the other members of the Grant party; that when the man entered the parlor his face was uncovered, but on noticing the witness look into his face, he took from his overcoat pocket a handkerchief and covered his face with it. While facing the wall a man came along and searched his pockets, took therefrom six or seven dollars in money and also the Elgin watch above referred to, with a chain which was attached to it.

The evidence of Alice Rovaro was similar to that of the other witnesses and corroborated them upon the main facts. Her interpretation of the threat was: "If you don't keep your hands up against that wall you will get the same thing that Mr. Schilling got out here."

The witness McGrew testified that while he was at the door leading from the kitchen into the parlor, the door from the parlor into the hall was open; that he saw Schilling when he answered the bell, saw a man enter the door from the outside wearing a mask and pointing a gun at Schilling; that he immediately heard Schilling say, "For God's sake, don't shoot!" He then testified that he left to give the alarm and on returning found Schilling lying with his feet near the door at which he had seen the masked man enter. After gathering the plunder together the men departed. When it became apparent

that they had left, Schilling was found dying on the floor of the hallway.

Mrs. Schilling testified that when the door-bell rang she was on the second floor at the head of the stairs and immediately after the shooting saw four men enter the door which the deceased had opened; that she heard the deceased say, "For God's sake, don't shoot! Take all"; that as they entered she was ordered back by one of the men and told to stay where she was or she would get the same.·

This, not being contradicted, is legal evidence enough, not [3] only to identify the defendant as one who participated in the robbery, but to fasten guilt upon him for the unlawful killing of the deceased. Upon these accounts of the transaction the jury found that Schilling was killed by one of the party of four engaged in the perpetration of robbery. This justifies the presumption that the killing was within the knowledge and intent of all. It was not, therefore, error to refuse to define the lesser degrees of murder.

This court has said that instructions on circumstantial evi-[4] dence, such as the defendant requested, are proper only when the prosecution relies exclusively on that class of testimony. On the other hand, if there is direct testimony respecting the *corpus delicti*, that sort of an instruction is properly refused. There was direct evidence of the robbery and of the killing, and indirect evidence in support of both. (*State* v. *Calder*, 23 Mont. 504; 59 Pac. 903.) As is said by Mr. Justice Holloway in the very recent case of *State* v. *Reagin*, 64 Mont. 481, 210 Pac. 86: "Having determined that the homicide was committed in an attempt to perpetrate robbery, it follows that the major crime actually committed was murder of the first degree, for section 10955, Revised Codes of 1921, declares, among other things, that all murder committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem is murder of the first degree."

Counsel complains bitterly of the fact that upon one side of [5] the tags attached to the guns taken from the defendant

and introduced in evidence were lead pencil memoranda stating facts of which there was no evidence to sustain. The one most objectionable, presumably, contains a legend which reads as follows: ''Gun that was used to kill Schilling. This gun carried by Bill Harris. Belongs to Monte.'' His contention is, not that the guns with the tags attached were passed to the jury for their inspection or that the legend was actually read by them, but that they were introduced in evidence, placed upon the table and kept in a place where the memoranda might have been read by the jury. The county attorney's affidavit was to the effect that the exhibits were never passed to the jury, and, while lying on the table in front of counsel, were not near enough to be read by any of the jurors. This, as the trial court held, was sufficient to remove that presumption. The defendant suffered no injury on that account.

Turning now to the accusation, so fervently urged, that the [6] prosecuting officers, in order to induce the jury to convict the defendant, caused the alleged confession of the defendant Graham to be published in the ''Butte Miner.'' All the evidence to support this charge is given in the affidavit of Mr. Blodgett, defendant's attorney, and is solely to the effect that on the morning of February 25, while the bailiff, under the court's admonition, was conducting the jury through the streets of the city to a cafe for breakfast, they heard the facts of the alleged confession through the medium of newsboys who were calling out in loud tones the fact that such an article was then in the paper; that the purported confession was a general topic of conversation in and about public places in the city of Butte and on the street, and was freely and openly discussed. Nowhere does he give the specific time or place at which the jurors heard, or might have heard, of the confession. Still he insists that this became an important factor in bringing about the verdict of guilty. The affidavit of T. F. Donohue, the bailiff, was to the effect that, under the court's direction and admonition, he took charge of the jury at the beginning of the trial, kept them together and permitted no one to communicate with them regarding the cause; that on

February 25, the day referred to in the affidavit of Mr. Blodgett, he still had the jury in charge and continued to have them under his control until the verdict was returned; that during all of the time the cause was being tried "no newsboy or newsboys communicated the contents of the newspaper article containing the alleged confession, nor did any other person communicate with them in any manner whatsoever regarding the trial or the evidence in the cause." Had the record disclosed the fact that the prosecuting officers had adopted the public press as a means of getting the statement of Graham before the jury, it would have been reprehensible conduct deserving of severe censure. (*State* v. *Walker,* 133 Iowa, 489, 110 N. W. 925.)

The above summary of the evidence is not designed to be exhaustive. It is, nevertheless, enough to furnish a sound basis for the verdict of the jury, and to overcome the imputation that the conviction of the defendant was brought about by the misconduct of the prosecuting officers to satisfy the public demand for a conviction, without respect for the legal rights of the defendant guaranteed him by the Constitution.

The proceedings at and since the trial, including the charges of misconduct against the prosecuting officers, were carefully considered by the able and conscientious judge who presided throughout the case in the trial court. He found that there was no substantial ground upon which the defendant ought to be allowed a new trial and denied his motion therefor. We have subjected all the questions presented to the district court to another critical examination, and are of the opinion that the defendant was accorded all his substantial rights and that that court committed no error.

The judgment and order appealed from are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY, GALEN and STARK concur.

Rehearing denied February 27, 1923.