STATE, Respondent, *v.* MILLER, Appellant.

(No. 6,954.)

(Submitted March 14, 1932. Decided March 21, 1932.)

[9 Pac. (2d) 474.]

*Mr. H. H. Hullinger* and *Mr. T. W. Robinson,* for Appellant, submitted a brief; *Mr. Hullinger* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. S. R. Foot,* Assistant Attorney General, *Mr. Bert I. Packer,* County Attorney of Teton County, *Mr. E. E. Sweitzer,* County Attorney of Pondera County, *Mr. Walter Knaack,* County Attorney of Toole County, and *Mr. Art Jardine,* for the State, submitted a brief; *Mr. Jardine* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Harry E. Miller has appealed from a judgment of conviction of the crime of murder in the first degree on which he was sentenced to life imprisonment in the state penitentiary. He predicates error upon the court's refusal to instruct the jury to the effect that he might be convicted of a lesser crime than that charged, and, without assignment of error therefor, his counsel argue that the evidence, which is wholly circumstantial as to the crime charged, is insufficient to warrant the verdict and judgment. Owing to the gravity of the case, the two matters presented will be considered as though raised by assignment of error in conformity with the rules of this court.

1. The information herein charges that Thomas Harrison Groves and Harry E. Miller did, on the twentieth day of September, 1930, deliberately and of their premeditated malice aforethought, kill and murder one John Joseph Wright, who was found dead on a southbound Great Northern freight train. The theory of the state was, and is, that Wright was killed by Groves or Miller in the perpetration, or attempted per-

petration, of robbery, and, if the judgment can be sustained, it is only upon that theory; there is not the slightest suggestion in the record of any other tangible theory of homicide.

Section 10955, Revised Codes of 1921, declares that "all ▮▮▮▮ murder * * * which is committed in the perpetration or attempt to perpetrate * * * robbery * * * is murder of the first degree." The trial court is required to instruct the jury on lesser degrees of a crime charged, or included crimes, only when the evidence would warrant a conviction of such other crimes (*State* v. *McDonald*, 51 Mont. 1, 149 Pac. 279); consequently where, as here, a defendant is either shown to have participated in a robbery, or attempted robbery, during which a homicide is committed, or the evidence fails to show that fact beyond a reasonable doubt, the only permissible verdict is either murder of the first degree or acquittal, and the trial court is not required to instruct on murder in the second degree. (*State* v. *Harris*, 66 Mont. 25, 213 Pac. 211; *State* v. *Bolton*, 65 Mont. 74, 212 Pac. 504.) The fact that the state relies upon circumstantial evidence for a conviction does not alter the rule; if the circumstantial evidence is sufficient to warrant a conviction, the verdict can only be first degree. (*People* v. *Watts*, 198 Cal. 776, 247 Pac. 884.)

No error was committed in refusing the offered instructions.

2. The evidence on which the defendant was convicted is as ▮▮▮ follows: Shelby is at the intersection of the Great Northern Railway lines extending east and west, north and south. On September 19, 1930, about twenty-five "transients" or "floaters" were there congregated, thirteen of whom were awaiting an opportunity for a free ride south to Great Falls and intermediate points; of these latter were Groves and Miller, who seem to have remained aloof from the other men, most of whom were gathered about a fire until the south-bound freight train left Shelby at 2:40 A. M. Miller and Groves inquired of Charles Neilson, special agent of the Great Northern as to when they could get a freight to Great Falls, at 10:30, and appeared at the fire about a half an hour before the train pulled out; they were described by Neilson and

others as follows: Groves was rather short and stocky; had a crippled hand and wore a light cap and dark outer coat with patches of leather on the shoulders and cuffs. Miller was about five inches taller than Groves; had a bunch or boil on his left cheek, and wore a reddish brown plaid mackinaw. According to Miller's statement after his arrest, the two did not separate at any time during the night of September 19–20. Five of the men who spent the time, prior to leaving Shelby, at the fire, were Robert Clark and Charles Brackley, who had been in the forest service, C. O. Dorris, who described himself as a ''broken switchman on the tramp,'' Forrest Haney, a laborer, and John Joseph Wright, an English war veteran, who was hard of hearing.

When the freight was about to pull out, Clark, Brackley and Dorris boarded a gondola car in the center of the long train. Wright went ahead toward the engine, saying that he was going to ride in a narrow space in the rear of a like car loaded with lumber. At the side of the train Haney met Miller and Groves, one of whom asked him where he was going, and, on his reply that he was going to Great Falls, said, ''There is the Great Falls train, get on it.'' Haney boarded an empty refrigerator car several cars to the rear of that in which Clark, Brackley, and Dorris rode; he pulled the ''flap'' in after him, which act probably saved him the sum of $160 he had in his pocket. Shortly after the train started, he heard two men go over the top of the refrigerator car. Likewise, shortly after the train started, Clark, Brackley, and Dorris saw two men—a short one and a tall one—coming over the train. They had their collars turned up and caps pulled down, and, in the dark, their features were not visible. These two entered the gondola car; the short one produced a flashlight and automatic pistol, and ordered the three to throw up their hands. While the short man covered the three with his gun, the tall one first searched Clark, from whom he took two $20 bills, one $10 bill, three silver dollars, and some small change. Clark was then ordered over the side of the car; he hesitated, and a shot was fired at him as he dropped. Brack-

ley was then searched; he yielded but $1.40; he jumped over the side without delaying the manner of his going, and fell in such manner that he did not regain consciousness for several hours. Dorris in the beginning told the robbers that he had no money; when it came time to search him, the short man told him that, if he had "lied," a hole would be blown through him; fortunately, perhaps, he had told the truth. Being an ex-railroad man, when Dorris went over the side, he was able to catch the train farther back; he mounted to the top of a box-car, and from there saw the robbers going forward over the train in the direction of the car in which Wright was riding. During the holdup the flashlight played upon the light cap and leather patches on the shoulders of the short man and also upon the reddish-brown plaid mackinaw worn by the taller man.

The train stopped at Dutton, and Dorris, becoming uneasy as to what might have happened to Wright, went forward to the lumber car, where he found Wright, huddled in the end of the car, dead; he notified the conductor. Wright was wearing two pairs of overalls; in the pockets of the inner pair were found certain war medals, but the pockets of the outer pair were empty and turned, at least partially, inside out; letters, papers, a toothbrush and a case for glasses were scattered over the floor of the car. Wright had been shot through the body from left to right. The nature of the wound is significant; an autopsy disclosed that the punctures of the skin and of the muscles were in apposition only when the man's hands were raised above the head, and, had his arms not been in the air at the time the shot was fired, one or both arms would have been pierced by the bullet. An empty .32-caliber shell was found in the car where the three men were robbed, and three similar shells were found near Wright's body.

Groves and Miller appeared eleven and one-half miles southeast of Conrad four hours after the train on which the homicide occurred stopped at Conrad. They asked the way to the nearest railroad, and were told they had been going away from it; they continued in the opposite direction, and were seen

later in the day, still going southeast. They stopped that night at a ranch forty-five miles from Conrad, a like distance from Great Falls, and a like distance from Ft. Benton. There they said they had come from Great Falls and were going to Ft. Benton. The owner of the ranch and his wife were in Great Falls, where they heard of the killing and learned a description of the suspects. They returned home that night, and in the morning, on seeing the two men, the wife drove to Brady where she advised a deputy sheriff that they were at the ranch. The deputy and another man set out and overtook them on the road to Ft. Benton. In the pocket of Groves' outer coat—that with the leather on shoulders and cuffs—the officers found a .32-caliber automatic and shells therefor. Groves claimed the gun, and stated that he had owned it for two years, and that it had never been out of his possession.

The officers found two $20 bills, a $10 bill, and three or four silver dollars and some small change in the possession of Miller. The paper money corresponded in appearance with that taken from Clark; Miller also had a $5 bill, unaccounted for.

In jail, without their outside coats, the men were "partially" identified by the men who were held up as the holdups.

The automatic, ammunition and empty shells were sent to L. S. May, criminologist of Seattle, who made exhaustive tests and microscopic examination of the gun and shells, and took "photomicrographs" of the breach block and heads of the shells; these pictures of small objects are more than six inches in diameter. They are extremely interesting. The expert explained that, in the manufacture of weapons, the tools used become worn; files fill with particles of metal, and the result is that no two breach blocks, against which, when a shot is fired, the recoil drives the head of the shell with terrific force, are alike. He graphically explained that the features of each breach block are as distinctive as those of a human face. On the breach block of Groves' gun appear twenty-odd irregularities, and each of these is faithfully depicted on each of the shells found on the train, and the face of each shell, in

its markings, is the counterpart of the face of each shell fired for experimental purposes, thus demonstrating beyond peradventure of a doubt that the shell found where the shot was fired at Clark, and each of the shells found beside Wright's body, were fired from Groves' gun.

The coats admittedly worn by Groves and Miller on the night of the murder were introduced in evidence and are before us, and they, as well as the general appearance and comparative size of the men, render the description of the two holdup men applicable to Groves and Miller.

In determining the sufficiency of circumstantial evidence to ▮ warrant a conviction, the facts and circumstances tending to show the opportunity, possession of the means, predilection to commit, and retention of a motive for the commission of, the crime, that the crime was one of a series of crimes committed in the prosecution of a criminal scheme or plan, the possession of the fruits of the crime, and the conduct of the accused both before and after the commission of the crime, are all important factors.

Here the defendant's opportunity to commit the crime was shown, in that it is clear that he was present at the scene and time of the homicide. Miller and Groves were present at Shelby, and must have boarded the train there, as it is evident they left it at Conrad, and this in spite of their expressed intention to go to Great Falls; they later falsified as to the point from which they had come. Groves was found in possession of the weapon with which the homicide was committed, and the same weapon was used in committing the crime of robbery, accompanied by threats of murder, just prior to the killing of Wright.

The evidence warrants a finding that Groves and Miller ▮ committed the robberies and then went forward toward the place where Wright was known to be riding. The conduct of the holdups evidences a plan or scheme to rob as many of the defenseless floaters riding the train as could be found. This defendant was with Groves all the time, and, if Wright was killed while being held up, all participants in the robbery,

or attempted robbery, were guilty of murder of the first degree. It is clear that Groves shot Wright, and, from the condition of the clothing and effects of the deceased and the nature of the fatal wound, no theory is tenable other than that he was shot while his hands were up and his pockets were rifled either before or after the shooting.

The evidence warrants a finding that Wright was killed in the perpetration, or attempt to perpetrate, robbery, and that Miller participated therein, and, consequently, warrants the verdict and sustains the judgment of conviction.

Judgment affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.