## Tax Review Board *v.* Slater System, Inc., Appellant.

Argued November 20, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*W. Wilson White,* with him *Mervin M. Wilf, Bernard V. Lentz,* and *White and Williams,* for appellants.

*James L. Stern,* Deputy City Solicitor, with him *Matthew W. Bullock, Jr.* and *Leonard B. Rosenthal,* Assistant City Solicitors, and *David Berger,* City Solicitor, for City of Philadelphia, appellee.

OPINION BY MR. JUSTICE BOK, March 15, 1960:

These are appeals from the judgment of the court below affirming the action of the Philadelphia Tax Review Board in holding appellants liable for the gross receipts tax under the mercantile license tax ordinance.

The two appeals involve companion cases which present one problem and concern tax assessments for the years 1953-1955. The facts are not disputed and the parties differ only in their legal conclusions.

Various businesses, schools, and other institutions find it desirable as a "fringe benefit" to offer their employes food, mainly luncheon, at prices below those to be found in outside restaurants. These companies have the equipment, including space and napery and cutlery, and they hire Slater to provide the food and service.

The disagreement between the parties is in Slater's contention that it is only the agent for the companies and should be taxable on nothing but the management fee which it charges, and in the City's contention that Slater is in the complete business of catering and operating cafeterias and should be taxable on its gross receipts, including management fee, operational costs, and the collected price of food sold to the employes.

We think that the City's view is the correct one. Slater's brief never uses the word "catering" and its counsel before the Board said specifically that his client was not in the "catering" business. However, the purpose clauses of its Articles of Incorporation include the following: "To provide a complete food service and to operate cafeterias, restaurants, canteens and other food dispensing units for individuals, industrial and business establishments, institutions and other organizations of all kinds. Also, to act as consultants and advisors in the industrial feeding business and to buy and sell, prepare, dispense, serve, and otherwise deal in food and eatables of all kinds, and all other articles used in *catering*. . . .

"The nature of the business for which this corporation is established, and the objects and purposes proposed to be transacted, promoted and carried on are:

Buying and selling, preparing, dispensing, serving, and otherwise dealing in food eatables of all kinds, and all other articles used in *catering*. To act as consultants and advisors for *catering* to hotels, boarding houses, fraternities, persons and organizations of all kinds." (Emphasis ours)

There was also offered in evidence a copy of Slater's typical contract with its clients, which contains the following provisions: "1. Company hereby grants to Slater as *an independent contractor* the exclusive right to sell food products, candy, tobacco, cigarettes and non-alcoholic beverages at its plant.

"2. Company agrees at its expense to provide Slater with suitable cafeteria space (including adequate sanitary toilet facilities and dressing rooms for Slater's employes) completely equipped and ready to operate. . .

"3. Slater Agrees:

"A. To operate *upon its own credit* a general *catering business* for the employes and visitors of the Company and to furnish nutritious, wholesome, palatable food at such hours as Company may from time to time determine.

"B. To submit for approval menus complete with prices to such person as Company shall designate at least twenty-four (24) hours in advance of offer for sale. . .

"C. At all times to maintain an adequate staff of its employes on duty at Company's plant . . .

"D. To take advantage of all trade discounts, which shall be credited to the cost of operations and to practice all feasible economies in the operation of the food service. . . . .

"F. To bear any loss resulting from dishonest acts on the part of its employes.

"G. To furnish Company with a certificate . . . that Slater carries workmen's compensation, compre-

hensive public liability, property damage and products liability insurance in such amounts as are acceptable to Company. The cost of such insurance shall be charged to the operation of the *business* conducted hereunder.

"H. To return to company at expiration of this contract 'the cafeteria premises and all equipment furnished by Company . . .' " (Emphasis ours)

The facts are that Slater makes its contract with its client, buys the food on its own credit, stores it in its own warehouse, takes all discounts and other price advantages, supplies the labor, puts forth the meals as agreed upon with the client, charges and collects the prices set by the client, and banks the money so collected in its own bank. The client, as said above, provides the cafeteria space, the dining equipment, and the utility services. There is a set percentage of the gross receipts from employes to cover overhead, and another for management fee. If the receipts from food are less than all charges, the client pays Slater the deficit, and only in rare instances are the receipts larger than the charges and a refund is due the client.

This arrangement strikes us as a general catering business run on the basis of cost plus a percentage fee. It is like the general contractor performing contracts on a "cost-plus-a-percentage" basis covered in §312(b) of the City's Mercantile License Tax Regulations, adopted December 9, 1952, under which the contractor must report as his gross receipts the full contract price. To report and pay a tax only upon the management fee would be to make this tax a profit tax, which is not the design of the taxing ordinance.

Appellant argues, to no purpose, that Slater was nothing but its client's agent, and cites *H. J. Heinz Co. v. School District of Pittsburgh,* 170 Pa. Superior Ct. 441 (1952) 87 A. 2d 85, and *Philadelphia School District v. Frankford Grocery Co.,* 376 Pa. 542 (1954),

103 A. 2d 738. But in *Heinz* the decision rested on the fact that Heinz, the taxpayer, operated its own restaurant without profit and hence was not liable for the tax. In *Frankford* the buying company was a nonprofit corporation and the stores for which it bought paid the tax. In the instant case Slater was in business for profit and made its money by contracting out its services and its skill as a caterer. As for its agency, each situation rests on its own facts, the main headings under which these fall appearing in *Mature v. Angelo,* 373 Pa. 593 (1953), 97 A. 2d 59. It is the actual relationship in the specific case that counts, and one may stand as both independent contractor and agent to another, as in *Commonwealth v. Minds Coal Mining Corporation,* 360 Pa. 7 (1948), 60 A. 2d 14; Restatement, Agency 2d, §2.

In the instant case the essence of the relationship was, as Slater's vice-president, Hutton, testified before the Tax Board, "to sell our professional skills", realizing that "it takes a sum of many skills to do a full professional job of food service planning" on which "the client necessarily relies". That the client nominated the menus and the prices to be charged its employes is no more than the shape and content of the service that it bought. Slater received no instructions from its clients how to order, store, prepare, and serve the food, and these things represent the very skills that Slater was employed to furnish and with which no one pretends its clients had anything to do. It retained essential and decisive control over the skillful service that it sold. Further, Slater had no concern for the prices the clients chose to charge their employes: the deficit to be paid to it was low or high depending on whether the prices charged for the food were low or high.

We have held in *Commonwealth v. Thorne Neale & Co.,* 264 Pa. 408 (1919), 107 A. 814, and *B. & Z. Ma-*

*chinery Co. v. Pittsburgh,* 375 Pa. 250 (1953), 100 A. 2d 98, that a fixed commission or profit is consistent with a sales contract for limited profits, and that there is no presumption that one is a broker apart from the objective facts of the particular case.

The tax ordinance was upheld, and the tax was declared to be an excise upon the privilege of doing business, measured by annual gross volume of business, in *National Biscuit Co. v. Philadelphia,* 374 Pa. 604 (1953), 98 A. 2d 182. The ordinance defines business as: "The carrying on or exercising for gain or profit within the City any trade, business, profession, vocation, or making sales to persons within the City, or any manufacturing, commercial or financial activity, service or business, including but not limited to manufacturers, brokers, wholesale dealers or wholesale vendors, retail dealers or retail vendors."

Slater, far from being a non-profit corporation, is clearly within this definition. It should report and pay the tax.

The judgment is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

I dissent. Slater Corporation is, in my judgment, merely an agent for various hospitals. The mercantile license tax must be strictly construed, and has not been and cannot be validly construed to tax an agent's gross receipts, or for example a broker's gross receipts, or a lawyer's gross receipts which cover the total sum payable to his client from which he deducts his fee and remits the balance, only the gross fees being taxable. In *Philadelphia School District v. Frankford Grocery Co.,* 376 Pa. 542, 103 A. 2d 738, this Court held that a company which acted as agent for multiple principals to purchase, store and distribute merchandise, was not

taxable on its gross receipts. The Court said, inter alia (page 552):

"Thus in Article III, Section 311(d) of its regulations it has excluded from the tax money received by an agent for the purchase of property for his principal, except to the extent that the agent deducts a commission therefrom, and by Section 303(d) and (j) permits the exclusion of receipts by an agent in reimbursement of advancements made by him on account of his principal. Section 311(a) excludes from the tax money received by an agent representing the proceeds of property sold for the account of his principal, the agent being required to report as taxable receipts only commissions retained by him from such monies. Similar exclusions are made with respect to commodity brokers, insurance agents and real estate brokers."

I would hold that Slater Corporation is liable under the mercantile license tax for the management fee which it receives, and for its so-called administrative expenses which together total 10 per cent. of its total gross receipts.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In order to develop and maintain a good relationship with their employes, many industrial establishments today provide cafeteria facilities for them. These eating places are often operated by other firms which, however, are under the direct control of the industry. Slater System, Inc., and Slater Corporation, two Delaware corporations with offices and warehouses in Philadelphia, operate cafeterias for industrial plants, schools and other institutions. The City of Philadelphia levied a mercantile tax on alleged "gross receipts" collected by these two corporations, which the corporations refused to pay, appealing to the Philadelphia Tax Review Board which sustained the imposed tax. A

further appeal followed to the Court of Common Pleas No. 6 of Philadelphia County which also upheld the tax, and both corporations then appealed to this Court.

For convenience in discussion we will refer to Slater System, Inc., and the Slater Corporation, since they are practically one, as the Slater Corporation and we will use the word "company" in referring to any particular corporation, plant, firm, school or institution for which the Slater Corporation performed it services.

The Majority of this Court has affirmed the decision of the lower court imposing a gross receipts tax on all Slater's collections and, by doing so, it has, in my judgment, worked an injustice. The Majority is compelling Slater to pay a tax on money which it never received as its own, never held as its own, and never reported as its own. At the oral argument in this case, Slater's attorney asked the hypothetical question: "Would anyone assert that a lawyer receiving a settlement for his client would be required to pay a gross receipts tax on that amount?" Neither his adversary nor any member of this Court answered that question in the affrmative. Yet, what this Court is now doing amounts to exactly what would be done in charging an attorney a tax on a settlement amount which, of course, would not be his, even temporarily.

The money which Slater received in running the restaurant business for its clients never became its own. The Majority gives away its case when it says: "If the receipts from food are less than all charges, the client pays Slater the deficit." If Slater were in business for itself as an independent contractor, the client would certainly not pay Slater for its losses. That would be the risk Slater would take as an independent contractor.

The Majority Opinion says very little about the facts in the case so that it will be necessary to enumer-

ate them because the facts in any case constitute the anatomy over which the skin of a decision is snugly draped. I think, by reciting the facts, we will see that the Majority's decision fits very badly the contours of the body of the controversy at hand.

At the hearing before the Tax Review Board it was definitely established that the companies which engaged Slater's services exercised decisive and overall control over Slater's operations. The companies provided room space for the cafeterias, they supplied all facilities, equipment, tableware, building maintenance service, water, gas, and electricity. They prepared the menus and, directed by those menus, Slater purchased the needed food, stored it and then served it at prices dictated by the companies. The companies reimbursed Slater for all its expenditures in connection with the food. In addition, the companies paid for licenses required by Slater, paid for health examination of its employees, and for premiums on workmen's compensation insurance taken out in behalf of the employees. While Slater selected the personnel which serviced the cafeterias, the companies reserved the right to dismiss employees. At all times the companies maintained a rigid control over Slater by dictating the menus, establishing the prices to be charged for the served food and scheduling the hours of restaurant service.

Although Slater deposited in its own name the money received from the cafeteria patrons, it kept precise record of these collections and deposits, all of which were open to inspection by the companies it served. It must be repeated that the money Slater collected was never Slater's money. What Slater received for its services was a management fee which usually amounted to 5% of the amounts collected in the cafeterias. Where the account with the company involved was a small one, Slater charged a flat amount, instead

of a percentage on the sales. The companies also guaranteed to Slater reimbursement for all direct operating expenses which included an allowance for general administrative costs, usually ranging from 5% to 15% of gross receipts. The allowance rarely covered the total actual administrative costs.

The Majority would tax Slater not only on the management fee and administrative allowances received by Slater, but also on monies collected from the companies' cafeteria customers (to be turned over to the companies) and all sums received by Slater from the companies in *reimbursement* for purchases made by Slater at the companies' behest. This amounts to confiscation because these funds no more belong to Slater, even temporarily, than railroad cars passing over a bridge constructed by the State belong to the State for that clattering moment they traverse the bridge.

The facts are as clear as sunrise, if only they will be looked at against the horizon of study and reflection, that Slater was merely acting as agent for its clients. If it were a general manager operating a restaurant for the companies involved, it could not be more an agent than under the circumstances here outlined.

The Majority Opinion says that the use of the word "catering" in the Slater typical contract of services establishes that it is a caterer and, therefore, being a caterer, it must pay a gross receipt tax on all monies it collects for the companies it services. But the word "catering" carries no such all-inclusive significance. A caterer is merely one who purveys food in accordance with a specific agreement entered into between him and the person or company he serves. Of course, in the public mind a caterer is one who supplies the wedding breakfast while the wedding couple dreams of marital felicity or who makes all the arrangements for allegedly cooking and serving the rubbery chicken, cold

mashed potatoes and marble peas at public banquets. It may be that in many instances the caterer is paid so much per person served, and he undertakes all the risks involved in performing his services. But it does not have to be that way. A caterer may make any type of contract he wishes, and the person who engages him may also impose conditions peculiar to his project or business.

The Majority Opinion makes the mistake of assuming for the word "caterer" a definition which does not appear in the dictionary or in the lexicon of standard practice. Catering refers merely to the preparing and serving of food; it has nothing to do with the financial agreement entered into between the parties involved. Webster's Dictionary defines a caterer as "One who caters; specif., one who provides provisions and services, esp. for entertainments at clubs, private houses, etc."

It will be noted that the Slater contract contained many words in addition to the word "catering". And those other words specifically demonstrate that Slater was not a caterer in the sense conjured up by the Majority Opinion. Slater was strictly an agent for the companies it served.

The Majority Opinion attempts to equate the Slater contracts with the cost-plus-percentage type of contract, but the sought-for equation is unacceptable because we are not here dealing with a relationship where the contract price is solely built on a cost-plus percentage basis so that the total contract price becomes the independent contractor's remuneration and therefore accountable by him as part of his gross receipts. We have, instead, a relationship where the Slater Corporation acts as an agent for those expenditures. It is part and sinew of the contract that the reimbursement for moneys expended is in no way to be associated with the fee to be paid Slater for services rendered.

Slater did not have freedom to purchase such food as it desired in servicing the cafeterias. It could only purchase what the company-dictated menus indicated. Slater could not prepare the food in any way it wished. It was required to prepare the food as its clients ordered. When Slater served the food, it could not charge what it wished, it could only charge what the companies ordered should be charged. Upon this basis Slater could be operating at a deficit at all times, if the companies so desired. How, then, can it be argued that Slater was an independent contractor? A horse with a saddle on his back, a bit in his mouth, and checkrein at his head could hardly be more under the control of his rider than Slater was under the control of the companies it served.

The fact that Slater purchased the food in its own name and on its own credit did not destroy the agency relationship. Section 187 of the Restatement, Agency, comment a, recognizes this: "Where an agent lumps the orders of two undisclosed principals, each of whom has ordered only a portion of the total amount and has not agreed to be jointly liable, the agent is the holder of the entire contract for the benefit of his two principals, but does not thereby subject them to direct liability upon the contract . . ." An agent may, if he wishes, assume the credit risk while acting for the principal. *Commonwealth v. Minds Coal Mining Corp.,* 360 Pa. 7.

Nor is it material that the contract between Slater and its clients failed to designate him as "agent": "The relationship of agency is created as the result of conduct by the parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control. It is not nec-

essary that the parties intend to create the legal relationship or to subject themselves to the liabilities which the law imposes upon them as a result of it . . ." (Restatement, Agency, comments a and b to §1.)

The Majority Opinion fails to distinguish between sums received by Slater in its own behalf and moneys collected in behalf of its clients. It ignores the distinction made in the very Mercantile Tax Regulations themselves. Section 311(a) of the regulations provides: "Receipts from sales made, or services rendered by an agent for the account of his principal are to be reported by the principal. It is immaterial in such cases whether the customer or client remits directly to the principal, or to the agent for transmittal to the principal. *The agent is required to report as gross receipts only the commission withheld by him as compensation for his services before remitting to his principal and any commission paid to him after remitting to his principal.*" (Emphasis supplied)

This provision demonstrates quite clearly that the mere fact money passed through Slater's hands did not label it as gross receipts. By way of illustration, a real estate agent who collects rents for his principal is not required to list those rents as gross receipts. Section 316(a) of the regulations reads: "Real estate brokers and agents are required to report as taxable receipts the commissions and fees received for services rendered as agent in promoting the purchase and sale of real property for others and/or managing real property for others." It is to be noted that the regulation speaks of "commissions and fees", and not of rents themselves.

Although the regulations refer to real estate agents by name, the logic and the justice which apply to real estate agents cannot be denied to agents who operate on the same principle as does Slater. It would take

authority and a line of reasoning not found in the Majority Opinion to establish the logic and justice of including within "gross receipts" the amount collected by Slater in behalf of its clients, especially when we consider Section 311a of the regulations which states that: "The agent is required to report as gross receipts only the commission withheld by him as compensation for his services."

In *Chalupiak v. Stahlman,* 368 Pa. 83, 88, we approved the definition of agency in §1, Restatement, Agency, as follows: "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."

The Majority Opinion fails to demonstrate that Slater is not an agent for the companies it represents. It merely recites some general agency rules without in any way specifying how those rules bear on the case at bar. For instance, the Majority says: "As for its agency, each situation rests on its own facts, the main headings under which these fall appearing in Mature v. Angelo, 373 Pa. 593 (1953) 97 A. 2d 59. It is the actual relationship in the specific case that counts, and one may stand as both independent contractor and agent to another, as in Commonwealth v. Minds Coal Mining Corporation, 360 Pa. 7 (1948), 60 A. 2d 14: Restatement, Agency 2d, §2."

This statement can hardly be regarded as a high-powered light illuminating the problem to be solved in this case. It is elementary that each situation rests on its own facts, and that is exactly what I have endeavored to show, namely, that the facts prove beyond cavil that Slater is an agent and not an independent contractor. The Majority Opinion lights another flickering candle when it says that "it is the actual re-

lationship in the specific case that counts, and one may stand as both independent contractor and agent to another." Who says that it is not? Does the Majority mean that Slater is both independent contractor and agent to its companies? As I read the Majority Opinion, it simply raises questions instead of giving answers.

The Majority says: "To report and pay a tax only upon the management fee would be to make this tax a profit tax, which is not the design of the taxing ordinance." This does not follow because, after excluding monies collected into the cash register from cafeteria-customers and after excluding monies received by Slater from its clients in reimbursement of expenditures made by Slater in behalf of the clients (purchase of feed, etc.) there would still remain for taxation as gross receipts the administrative allowances received by Slater, because these allowances were not actually direct reimbursement of expenditures incurred in behalf of the clients. They constituted payment to Slater for *its* costs and not in payment of expenditures made as agent for the companies. Then, there remained of course for taxation the management fee which, contrary to the apparent assumption of the Majority, did not become Slater's profits. The profit approximated only one-half of that figure.

The court below at least attempted to apply the law to the facts in the case and, in doing so, was forced to admit that "We think for some purposes it [Slater] is their agent. It may even, for some purposes, be the servant of the companies so that they would be liable even for its torts. It may for some purposes be a non-servant agent for whose contracts the principal might be held responsible as a disclosed or undisclosed principal. We, of course agree with the fact that an independent contractor may be for certain purposes an

agent, all of which is clearly set forth in Section 2 of the Restatement of Agency, Section and the comments to that section.

"We agree, too, that the test is right to control and we may agree that the principal has retained substantial rights to control the activity of the agent in this case. We suppose the principal at any moment could prevent Slater from serving food to its employees subject only to the obligation to pay damages for the breach of contract."

However, after all these admissions of proof of agency, the court of common pleas invited Slater to the food counter but refused to let Slater eat of the food of exemption from taxes on money collected by an agent for his principal. The court of common pleas arbitrarily said: "The taxpayer is carrying on a business for profit and therefore it is taxable under the ordinance on its gross receipts whether or not in the carrying on of that business, it acts in some respects as an agent for the persons whose employees it serves."

And the Majority of this Court has simply repeated the arbitrary treatment of the court of common pleas. It says: "In the instant case Slater was in business for profit and made its money by contracting out its services and its skill as a caterer." Who doubts that Slater was in business for profit? No one asserts that it was an eleemosynary institution. Of course, Slater was in business for profit just as a real estate agent is in business for profit, but this does not say that the real estate agent must pay gross receipt taxes on all rents collected by him for his landlord.

The Majority insists on emphasizing the obvious and then from the obvious proceeds to the occult. It says that Slater is "far from being a non-profit corporation," and then peremptorily orders Slater to pay the gross receipts tax because it comes, the Majority says,

within the definition of a business as defined in an ordinance which has nothing to do with this case and which is referred to in a couple of wholly unrelated cases. How and why the Majority comes to its conclusion that Slater is an independent contractor and not an agent, if indeed it comes to that conclusion, is left to supposition, conjecture and helpless surmise.

And so, I dissent.