No. 82-180(B)

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

STATE OF MONTANA,

            Plaintiff and Respondent,

    -vs-

ADAM WEINBERGER,

            Defendant and Appellant.

Appeal from:  District Court of the Fifteenth Judicial District,
              In and for the County of Roosevelt,
              The Honorable M. James Sorte, Judge presiding.

Counsel of Record:

      For Appellant:

            Moses Law Firm; Stephen Moses argued, Billings,
            Montana

      For Respondent:

            Hon. Mike Greely, Attorney General, Helena, Montana
            Chris Tweeten argued, Asst. Atty. General, Helena
            James McCann, County Attorney, Wolf Point, Montana

                              Submitted:  May 12, 1983

                              Decided:  October 6, 1983

Filed:    OCT 6 - 1983

            *Ethel M. Harrison*
_____
                Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Adam Weinberger appeals to this Court from a judgment of conviction against him of deliberate homicide based on jury verdict, the judgment having been entered in the District Court, Fifteenth Judicial District, Roosevelt County. We reverse his conviction for the reasons hereafter stated.

Adam Weinberger was charged in District Court with two counts of deliberate homicide. In count one, he was charged with aiding or abetting Arrow Weinberger in causing the death of Floyd Azure in violation of sections 45-5-102(1)(a) and 45-2-302(3), MCA. In count two, he was charged with felony murder, in that the death of Floyd Azure was caused while Adam Weinberger attempted the crime of aggravated assault, a felony, in violation of sections 45-5-102(1)(b), 45-4-103 and 45-5-202(1)(c), MCA.

The jury returned a verdict of guilty against Adam Weinberger under count two, the felony-murder charge. The jury returned an inconclusive verdict as to count one, finding Adam neither guilty or not guilty of the charge of aiding and abetting Arrow Weinberger in the death of Floyd Azure. Because the jury failed to find Adam guilty on count one, we regard the inconclusive verdict as one of not guilty on that count. It has so been treated by the parties.

We reverse the conviction in this case because we find that the evidence is insufficient as a matter of law to support the judgment and conviction of felony-murder.

Before we review the evidence, it is well to set out the applicable requirements for conviction for felony-murder, where the defendant is not the actual killer, but is charged

with felony-murder because he is engaged in committing a felony in conjunction with the actual killer so as to cause of death of the victim.

In State ex rel. Murphy v. McKinnon (1976), 171 Mont. 120, 126, 556 P.2d 906, 910, we said:

> "[W]e note with approval the following guidelines as to the applicability of the felony-murder rule stated in 1 Wharton's Criminal Law and Procedure (Anderson) section 252, P. 543:

> "'For the felony murder rule to apply, it is necessary that the homicide be a natural and probable consequence of the commission or attempt to commit the felony; that the homicide be so closely connected with such other crime as to be within the res gestae thereof; or the natural or necessary result of the unlawful act; or that it be one of the causes.. . .

> "Something more than a mere coincidence of time and place between the wrongful act and the death is necessary. It must appear that there was such actual legal relation between the killing and the crime committed or attempted that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it.'"

> "Thus for the felony-murder rule to apply a causal connection between the felonious act and the death must be present. (Citing cases.)" (Emphasis added.)

In State v. Close (1981), ___ Mont. ___, 623 P.2d 940, 38 St.Rep. 177, we held that felony-murder and the underlying felony charge do not merge, and sustained convictions as to both criminal charges.

It should be recognized that all who participate in a crime or an attempted crime during which a homicide is committed are guilty of deliberate homicide, irrespective of which one of the participants fires the fatal shot, State v. Miller (1932), 91 Mont. 596, 9 P.2d 474 (construing earlier statutes).

All conspirators in a plot to commit a crime are equally guilty of deliberate homicide if during the course of the

- 3 -

commission of the crime a death results which is directly attributable to the plot to commit the crime. State v. Morran (1957), 131 Mont. 17, 306 P.2d 679.

By statutory definition, felony-murder is a deliberate homicide which is committed while the offender is engaged in the commission of an enumerated felony, or "any other felony which involves the use or threat of physical force or violence against any individual." Section 45-5-102(1)(b), MCA. It follows, therefore, that if the proof of the commission of the underlying felony fails, the purported offender is not guilty of felony-murder.

The underlying felony with which Adam is charged in this case is the offense of attempted aggravated assault. Aggravated assault in this case, excluding portions of the statute not applicable here, would be upheld if the State proved:

> "[the defendant committed] the offense of aggravated assault if he purposely or knowingly causes:
>
> ". . .
>
> "(c) reasonable apprehension of serious bodily injury in another by use of a weapon." Section 45-5-202(1)(c), MCA.

He committed the offense of attempted aggravated assault, if, with the purpose to commit that specific offense, he did any act toward the commission of that offense, section 45-4-103, MCA.

As we stated in State ex rel. Murphy v. McKinnon, supra, there must be a causal connection between the felonious act and the death. Our statutes define causal relationship in section 45-2-201, MCA. Conduct, under that statute, is the

- 4 -

cause of a result if without the conduct the result would not have occurred.

In capsule, then, in order for the State to convict Adam Weinberger of deliberate homicide under the felony-murder rule, it was the duty of the State to prove (1) that Adam Weinberger acting in concert with Arrow Weinberger knowingly or purposely attempted an aggravated assault upon Scotty Azure; or (2) that Adam and his father, Arrow Weinberger, had a pact, design or common plan to commit an aggravated assault or homicide upon Scotty Azure, and that Scotty died as a result of their execution of such common plan. In either case, it was the duty of the State to prove that Adam's attempted aggravated assault caused the death of Scotty Azure, without which cause Scotty's death would not have occurred.

"It is not the purpose of the felony-murder rule to foist authorship of a homicide upon a felon; the purpose is merely to clothe the felon's act of killing with malice." 2 Wharton's Criminal Law (14th ed.) 221, § 149. Under Montana codes, we would substitute "knowledge or purpose" for the word "malice." Section 45-2-103, MCA. The Pennsylvania Supreme Court noted in Commonwealth v. Redline (1958), 137 A.2d 472, 476:

> "In adjudging a felony-murder, it is to be remembered at all times that the thing which is imputed to a felon for a killing incidental to his felony is _malice_ and _not_ _the_ _act_ _of_ _killing_. The mere coincidence of homicide and felony is not enough to satisfy the requirements of the felony-murder doctrine. 'It is necessary . . . to show that the conduct causing death was done in furtherance of the design to commit the felony. Death must be a consequence of the felony . . . and not merely coincidence.' (Citing authority.)" (Emphasis in original.)

- 5 -

Against this backdrop of applicable law, we now advert to the facts in this case, regarding them in the light most favorable to the State.

Floyd "Scotty" Azure was shot to death by Adam's father, Arrow Weinberger, during the confrontation at a gas station in Culbertson, Montana, on December 5, 1981.

Scotty Azure and his wife, Gloreen, were the parents of a 17 year old daughter, Luanne, who had developed a relationship with Adam Weinberger in June 1981. The parents did not approve of this relationship and actively discouraged it because of the difference in age between Adam and Luanne and because of Adam's failure to "act like a gentleman." Despite the parents' objections, however, the relationship between Adam and Luanne continued. In early November 1981, Luanne left home with a friend and went to Havre, Montana. She there planned to and later did meet with Adam in Williston, North Dakota. During the two days of her absence, Luanne's parents searched the Poplar area for her without success. On November 12, 1981, the parents went to Williston to look for Luanne. There they found Adam who told them he had not seen Luanne and thought she was in Havre, Montana. The Azures later found Luanne in Williston and learned she had, in fact, been with the defendant.

After this incident the parents began to watch Luanne very closely because they did not want her around Adam Weinberger at all. On December 1, 1981, Luanne ran away from home. The Azures were convinced she had again run away with the defendant based on the prior incident in Williston, and they began to search for Adam, enlisting the aid of local law enforcement officers. At the request of the Azures, the police stopped the father's automobile to look for Luanne.

The father and son later visited the Azures to register their displeasure at being stopped. Arrow Weinberger, the father, was upset and told the Azures he did not like to get upset because "when I get upset I stay upset."

Two days later, Luanne had not been found. The Azures continued to look for her and on the second day found Adam in the company of Maybell Archambeau, an 18 year old girl. The Azures asked Maybell if she was permitted to talk to Adam. Adam used a profane expression in telling the Azures to get out of there. That evening, the Azures contacted Roy Trottier, a federal Indian police officer, and sought his help.

The next morning, Scotty Azure learned that Luanne had been seen with the defendant on December 1, 1981. The Azures immediately found Trottier and told him that if they found the defendant they would report his whereabouts to the police and then if they found Luanne they would bring her to the police. Trottier approved of the plan. The Azures then began a search for Adam's car, enlisting the aid of Carol Lee Azure, who was Gloreen Azure's sister, and Rodney Azure, Carol Lee's husband and a cousin of Scotty Azure. Carol and Rodney found Adam's car in Brockton that afternoon and notified the police. The police, however, were unable to locate Adam. Carol and Rodney then attempted to locate Gloreen and Scotty. They met the parents' car following Adam's car on the Fort Kipp Road and turned around to follow. After the cars turned toward Culbertson, the entourage was passed by the father's (Arrow Weinberger) white Cadillac. At a signal from Adam, Arrow pulled off to the side of the road to stop and talk to Adam. The two Azure cars proceeded past the two stopped cars into Culbertson where they stopped at

the Standard gas station. When the Weinberger cars stopped at the side of the road, there were four occupants of the cars. Arrow Weinberger, the father, was accompanied by his brother Frank. Adam was accompanied by a hitchhiker named Thomas Hanzlick. Hanzlick remained in the defendant's car as Adam went over to talk with Arrow Weinberger. Frank Weinberger who was apparently intoxicated, had no recollection of the stop. Hanzlick testified at the trial that when Adam returned to his car from talking with Arrow, Adam told Hanzlick that Arrow Weinberger was going to talk to the Azures. Hanzlick concluded there "might be a fight." Lenny Barkie, a passing motorist, saw the cars pull away from the shoulder at a high rate of speed and testified that the occupants of the father's car (Arrow Weinberger) were "laughing to beat heck."

At the gas station in Culbertson, Scotty Azure parked his car facing the side of the building to the right of a red pickup truck. Rodney Azure parked some distance behind the pickup. Gloreen and Carol Lee Azure proceeded to the front of the gas station while Rodney and Scotty Azure remained outside. As this was occurring, Arrow Weinberger's Cadillac was driven up and parked directly behind Scotty Azure's car, blocking it in. Adam followed and parked at an angle to the right of Azure's car. The testimony of what happened next is in conflict. The State's witnesses, Gloreen, Carol Lee, and Rodney Azure all testified that Scotty Azure stood between his car and the pickup as Arrow Weinberger, the father, got out of his car. They testified that Adam then crossed between the Azure car and Arrow Weinberger's car toward the pickup saying "get your bat out, Azure." The witnesses saw

Adam reach into the back of the red pickup and grab a large chain lying there.

The State contends that the evidence shows that Adam doubled the chain over and threw it at Scotty Azure; that Scotty Azure had procured a baseball bat from his car, and he used it to deflect the chain; that Arrow, the father, then drew a .25 caliber pistol and shot Scotty Azure once in the chest, who died instantly.

After the shooting, the defendant, Adam, entered the station building and spoke with Gloreen, telling her, "I hope you are satisfied, you caused all of this trouble." Later Adam and his father were transported to the sheriff's office for questioning. Adam was seated in the front seat of the car while Arrow sat between two other persons in the back. At one point in the trip, Adam turned around and stated "that's one and four to go," (Scotty and Gloreen Azure had four sons). At the station, Hanzlick was interviewed after the Weinbergers. After his interview, he sat down next to Adam, who asked him what he had told the police. When Hanzlick told the defendant that his story was consistent with the Weinbergers, Adam smiled, laughed, and said "all right."

The foregoing are the facts essentially upon which the State claims that Adam committed the underlying offense of attempted aggravated assault. We have reserved, however, from the foregoing statement the testimony of the witnesses respecting the incident with the chain, because it is upon that evidence that the commission of the underlying felony depends, and because the evidence does not measure up to the State's claims.

The first witness was Gloreen Azure, the widow of the victim and the mother of Luanne, who observed the actual shooting through the windows of the gasoline station. In her testimony she mentioned nothing that connected Adam to the confrontation except that he was there.

Rodney Azure, the cousin of the victim, was standing beside the box of the red pickup to the right of the Azure vehicle when Adam came to the back of the pickup. He was the person closest to Adam Weinberger during the incident, and his testimony is pertinent. He stated:

> "Q.    When did the car driven by Adam Weinberger pull in there then?    A. Just a little while after his father pulled in.
>
> "Q.    Was he out of the car at the time Arrow Weinberger told Scotty to leave his son alone?    A. I don't know, I didn't at the time pay any attention.
>
> "Q.    Did you see Adam Weinberger get out of his car?    A.  He walked up to where we were.
>
> "Q.    Excuse me?    A.   He walked to where we were.
>
> "Q.    Was that before or after Arrow Weinberger told Scotty to leave his kid alone?    A.    After.
>
> "Q.    Did he say anything as he was walking up to where you were?    A.   He was walking and he told Floyd to 'Get your bat now, Azure.'
>
> "Q.    And where did Adam Weinberger go?    A.   To the back of the red pickup.
>
> "Q.    What did he begin to do?    A.   Looking around.
>
> "Q.    Did he find anything, or attempt to remove anything from the pickup?    A.   Yes, he tried to pull a chain out of the back of the pickup, over the end gate.
>
> "Q.    Did he actually get ahold of the chain?    A. Yes he did.
>
> "Q.    What did he do with the chain?    A.   He pulled it out of the pickup and was going to use it as a weapon or something.
>
> " . . .

"Q. Rodney, where were you standing when Adam came over to the back of this pickup? A. Right beside the box of the pickup.

"Q. And in relationship to the rear wheel where were you? A. Someplace close to it.

"Q. And where was the defendant Adam Weinberger standing as he was reaching for the chain? A. He was at the back end of the pickup.

"Q. Was Scotty in front of you or behind you? A. Behind me.

"Q. And was Arrow Weinberger behind Adam or in front of him? A. Behind him.

"Q. And where was he standing? A. By the car.

"Q. What part of the car? A. By the front wheel.

"Q. Now did Adam Weinberger retrieve all of the chain out of the pickup? A. No.

"Q. How much of it? A. I would say he pulled it three or four feet.

"Q. Now would you come down here and show me how much he pulled it? A. (Witness complies) Something like this.

"MR. RACICOT: Let the record reflect that approximately three feet of the chain, doubled over and hanging from the witness's hand.

"Q. What did he do with it? A. Well I thought that he was trying to throw it.

"Q. Underhand style? A. No, to the side, like this.

"Q. Swinging it? A. Yes.

"Q. At who? A. Scotty, I guess.

"Q. Did you see anybody put the -- was he swinging it like this? (Demonstrates) A. No.

"Q. Was it in a round about motion like this? A. Yes.

"Q. What were you doing? A. Oh I tried to get ahold of part of the chain, and I think I got ahold of part of it, on the back end of it, but I can't tell you how many feet.

"Q. Okay, you can be seated. (Witness sits down) Did the chain go towards Scotty? A. As far as I know it did. I don't know for sure; I didn't see what was hit.

- 11 -

"Q.    Okay, did you see Scotty swinging the bat at any time at Adam Weinberger?  A.  No I didn't.

"Q.  Did you see him swinging it at any time at Arrow Weinberger?  A.  No I didn't.

". . .

"Q.  And when did you see him do at that time, Sir?  A.  Grabbed for the chain.

"Q.  Grabbed the chain?  A.  Yes.

"Q.  What was he doing when he grabbed the chain?  A.  He pulled it out of the pickup.

"Q.  One end pulled out of the pickup?  A.  He had more then one end, he just grabbed a whole bunch of it.

"Q.  And then what did you do?  A. I tried to reach for the chain, and --

"Q.  Now just a second.  We have still got you up here --  A.  Well I moved over towards that pickup again, when he started moving.

"Q.  When Adam started towards the pickup, you headed towards the pickup again?  A.  Well I went over to see what he was looking for.

"Q.  He did not have a weapon that you knew of then?  A.  No, not then he didn't, that I knew of.

"Q.  And did you know what Scotty was doing?  A. No I didn't see Scotty.

"Q.  You had your back towards Scotty?  A.  Yes.

"Q.  Now, Adam was standing here, and you're standing just about where the wheel wells were, is that right?  A.  Somewheres in that vicinity.

"Q.  And he was pulling this chain out, this particular chain out of the back of the pickup and you grabbed one end of it, is that right?  A.  Yes.

"Q.  And he was trying to pull it out of the back end of the pickup and you got ahold of that other end?  A.  Well I more or less pulled it -- as he was pulling on it, I more or less just lifted it, you know, and then he jerked it away from me.

"Q.  Well what was Adam doing with this chain, he has the chain and you say you were kind of lifting your end of it up, and he was pulling on the other end of it, what did Adam do with this chain?  A. Took it away from me.

- 12 -

"Q. And so then when he had it out, he had about so much of the chain? (Demonstrates) A. I would say a little less then that.

"Q. About that much then? A. Yes about that.

"Q. And what did he do with it then? A. Threw it.

"Q. He is standing there facing the pickup -- A. Well he had moved back away from the pickup by then, a little bit.

"Q. How far? A. I don't remember how many feet, I didn't notice how many feet.

"Q. Well did he move a short distance or a long distance? A. A short distance I would say.

"Q. Short distance, say a couple of feet? A. Oh maybe a little more then that.

"Q. Maybe three or four feet? A. Maybe.

"Q. Okay, and do you still have a hold of the chain yet? A. Well I moved toward the end there.

"Q. Okay, and then what did he do with the chain, with this couple of feet? A. Threw it.

"Q. Where did he throw it? A. Behind me someplace.

"Q. Behind you someplace? A. Yes. At an angle.

"Q. He just sort of pivoted like this and gave a toss that way? A. Well I think he had it bunched up in his hand a little more than that.

"Q. Well what do you mean, by bunched up? A. Like this. (Witness comes off the witness stand and demonstrates.)

"Q. Okay, and then he threw it someplace? A. Someplace.

"Q. I take it at this time, you were still on this side of the pickup holding on to the chain? A. No I was standing like this to him, and I had ahold of the chain like this.

"Q. Okay, should we put the pickup here then, this way, the pickup be here? A. Well --

"Q. Well the fact of it is here the chain is still coming out of the back of the pickup, and you were on the other end of it and started lifting it up, is that right? A. Yes.

- 13 -

"Q.   So that you were facing into the pickup?   A. I was facing the side of the pickup, facing towards the back.

"Q.   This way, something of this nature, right? (Demonstrates)   A.   Yes.

"Q.   And Scotty was someplace over in here?   A. Yes.

"Q.   And then he threw the chain?   A.   Yes.

"Q.   And what did you do?   A.   I had a hold of the chain, I heard this shot and dropped it and took off.

"Q.   You had ahold of the chain, he threw the chain, out to here someplace, the shot was fired, and you dropped the chain?   A. Yes, I had it in my hands like this.   (Demonstrates)"   (Emphasis added.)

The next witness was Carol Azure, the wife of Rodney. She was standing on the sidewalk between Scotty Azure's vehicle and the red pickup, facing the actors.  With respect to Adam, she testified:

"Q.   And did you see Adam Weinberger at that point? A.   Yes I did.

"Q.   And where was he?   A.   He was coming towards the pickup.

"Q.   From where?   A.   From his car.

"Q.   And how fast was he moving?   A.   I don't know if he was moving so fast, but he was shaking, like he was mad or scared, I don't know.

"Q.   What did he say?   A.   All right, get your bat now.

"Q.   And where did he go?   A.   To the back of the pickup.

"Q.   Now where was Scotty during all of this?   A. Scotty was standing by the cavity of his door.

"Q.   Was the door open?   A.   At that point I don't know, I was watching Adam.

"Q.   Okay, was the door open when you first went up to the sidewalk to enter the station?   A.   Yes it was.

"Q. Was it at any point closed, to the best of your recollection? A. Not to the best of my knowledge.

"Q. Okay. Now after Adam walked -- did he walk between the white Cadillac and the blue car? A. Right.

"Q. And said, 'come on, Azure, get your bat now?' A. Yes.

"Q. After he said that, what did you next see? A. I was watching him and he grabbing a chain out of the pickup; and I don't know when Scotty got the bat, but I seen Adam with the chain, he swung the chain, I looked at Scotty and Scotty had the bat and he hit the car, and I never seen the chain hit Scotty, I just seen the bat hit the car.

"Q. And where was Rodney, your husband? A. (No response).

"Q. When Adam went to the back of the pickup, and got the chain and threw it, where was Rodney? A. It seems like he was right, maybe four feet away from Scotty and Adam was on this side.

"Q. Okay, so as far as people being closest and furtherest away from you, who was the closest to you? A. They looked to me like they were about the same distance.

"Q. Who did? A. Rodney and Adam. They were at a different angle and it seemed like they were right there.

"Q. And who was the closest person, between Scotty, your husband, Rodney, Adam Weinberger and Arrow Weinberger? A. Who was the closest to Scotty?

"Q. Who was the closest to you? A. I would say that Scotty was the closest.

"Q. And then who? A. And then Rodney.

"Q. And then who? A. Then Adam.

"Q. And then who? A. Arrow.

"Q. And did you see any struggle with the chain between your husband and Adam Weinberger? A. I seen his hand on the chain, but I don't know about any struggle.

"Q. Did you see Adam Weinberger withdraw that chain from the back of the pickup? A. I didn't see him pull it out, I seen him make a grab for it.

"Q. Did you see him with any of that chain in his hands? A. Yes I did.

- 15 -

"Q. How much? A. Three feet, I don't know.

"Q. Did you know -- or notice whether or not it was doubled over was it just one single link? A. I noticed that it was doubled.

"Q. And what did he do with that amount of chain that he had in his hand? A. He swung it.

"Q. And by that what do you mean? A. He just swung it.

"Q. And did you see where it went? A. It went toward where Scotty was standing and I seen Scotty hit the car with the bat.

"Q. And Scotty was holding the bat? A. Right.

"Q. And the bat did hit the car? A. Yes.

"Q. And the chain? What happened to the chain? A. I don't know.

"Q. Then after the chain had been hurled at Scotty and the bat hit the car, what did you next see? A. I heard the shot.. . ."

On cross-examination, Carol testified:

"Q. And what did Adam do with this chain? A. I seen him swing it.

"Q. How did he swing it? A. He just swung it.

"Q. Just like this? (Witness observes counsel swinging the chain) A. Yes.

"Q. Like this out in front of him? A. Yes.

"Q. Did he swing at your husband? A. I don't think so, no.

"Q. Did he swing at Scotty? A. I don't know.

"Q. And this distance you say of three or four feet was Scotty right there? A. Yes.

"Q. Right about here? A. Yes.

"Q. Standing right there, within three or four feet was your husband? A. Yes, but he was behind my husband.

"Q. How far behind Rodney? A. I don't know exactly three or four feet I suppose.

"Q. Let me straighten this out a little bit on this drawing here. Adam was standing back here by the back end of this pickup? A. Yes.

"Q. And Rodney then was three or four feet this way, by the wheel well, is that right? A. Seems like they were closer together when I seen them.

"Q. Right -- A. Not right together, but closer.

"Q. Rodney was up here? A. Yes.

"Q. Closer to the very back end of this pickup? A. Yes.

"Q. And where was Scotty? A. By his car door.

"Q. He was back by his car door? A. Yes.

"Q. And from State's Exhibit Number 7, it shows it is nine foot six inches away, is that right? A. Yes.

"Q. So that Scotty wasn't where he could get hit by Adam swinging that chain that way, could he? A. I don't know."


On redirect examination, Carol testified:

"Q. What happened when he swung the chain? A. I seen the chain swung, and I couldn't see where it hit, --

"Q. Well what I am getting at, Carol did the defendant, Adam Weinberger, or did he not, release the chain when he swung it? A. I don't know.

"Q. Did the chain go anyplace? A. I don't know that.

"Q. You didn't see the chain go like this? (Counsel throws the chain its full length on the courtroom floor)

"MR. S. MOSES: Objection, Your Honor, the witness has already testified.

"Q. You didn't see that occur? A. No."
(Emphasis added.)


Dr. Robert Bell was an eyewitness to the incident. His testimony respecting Adam is as follows:

"Q. And around 2:20 in the afternoon, P.M., can you tell us what you were doing? A. Well I come out of my house to get a tape measure out of my pickup.

"Q. On your way out, did you hear anything? A. Yes, I heard a chain rattling -- somebody was getting a chain out of a pickup.

"Q.   Did that call your attention to where that sound was coming from?  A.  When I heard the noise I looked over to see what was going on and there were two people in the vicinity of the back of the pickup and they were getting a chain out of the pickup.

"Q.   And by the pickup, again in reference to State's Exhibit No. 17, could you indicate if that vehicle is on that diagram?  A.  Yes, it would be where that red vehicle is indicated.

"Q.   And you saw two people at that vehicle, and where?  A.  At the northeast corner of it.

"Q.   It would be to the right and to the top of that picture.  A.  Yes, right.

"Q.   And what did it appear to you that they were doing?  A.  My first impression was that somebody had gotten stuck and somebody was getting a chain out of a pickup to pull them out.

"Q.   Did it appear that both people were trying to get the chain out?  A.  Yes.

"Q.   How many people were leaning over the edge of the pickup grabbing the chain?  A.  I think there were two.

"Q.   Did you watch those two people?  A.  Briefly. It is not unusual for me to come out of my house and see or hear some sort of activity at the service station there.

". . .

"Q. And the man that was shot, did you see him with the bat?  A.  I did not see a baseball bat at any time until after the shooting.

"Q.   Did you see him wield the bat at the man that was doing the shooting?  A.  No I did not.

"Q.   Did you see him threaten him in any way?  A. No I did not.

". . .

"Q.   If I understand your testimony right, when you came out of the house, you saw two fellows at the back end of this pickup?  A.  Correct.

"Q. Trying to lift out a chain?  A.  Trying to get this chain, right.

"Q.   And that they were apparently having some trouble getting the chain over the back end of this pickup?  A.  I would not characterize that as trouble.  I think that is a normal occurrence taking a chain out of a pickup.

- 18 -

"Q. But the chain was running down out of the back end of the pickup? A. I said it was rattling.

"Q. Oh, okay, it was rattling over the end of the pickup? A. Right, I don't know if it was rattling down or if they were backing up and pulling it out.

"Q. Did you ever see anybody swinging that chain at anybody else? A. No I did not. I did not continue to watch them with the chain.

"Q. All right. Were you watching this chain quite intentively? A. Not at that time, no. As I stated before, it is not unusual to have that kind of activity at the service station there.

"Q. So that you -- A. It is quite normal to see people taking something like a chain or something else out of a pickup, there at the station.

"Q. All the time? Every day you would see a chain -- A. No, not all the time. But that day I saw two people taking a chain out of a pickup." (Emphasis added.)

Thomas Hanzlick, a passenger in Adam's automobile prior to the incident, and a witness at the time of the incident, testified with respect to Adam:

"A. And Mr. Azure was on the back swing, I believe, I am not sure, I believe he was on the back swing like this here (demonstrates) and he was coming back towards Adam.

"Q. He was swinging now at Adam? A. I am not sure.

"Q. And where did the swing go, do you know? A. It was pretty close to Adam.

"Q. Do you know if he hit Adam? A. No I don't.

"Q. What happened to the chain? A. I am not sure, the next of the chain that I saw it was lying on the ground.

"Q. Did you ever see Adam Weinberger swing or throw the chain? A. No sir.

"Q. Did you ever see him swing it or throw it towards Mr. Azure? A. No sir.

"Q. Did you ever see him get it all the way out of the pickup? A. No I think it was still partly in." (Emphasis added.)

There is not an iota of evidence in the record that Adam knew before the shot was fired that Arrow had a gun available.

Adam Weinberger and Arrow Weinberger were tried together in the same case. Arrow Weinberger testified as a defendant in the case. Adam Weinberger did not testify. Nothing in Arrow's testimony is informative as to what Adam may or may not have done regarding the chain.

From the foregoing, it is clear: (1) the evidence fails to show that Adam swung the chain at or toward Scotty on testimony beyond a reasonable doubt; (2) there is no evidence that Scotty suffered serious bodily injury, or bodily injury as a result of Adam using a weapon; (3) there is no evidence from testimony or otherwise, that Scotty entertained a reasonable apprehension of serious bodily injury from the use of a weapon. These are the essential elements of an aggravated assault. Section 45-5-202, MCA. We will assume in these conclusions, that the chain here may be considered a "weapon," in the terms of the statute, since neither side contests the point. The evidence completely fails to establish an aggravated assault.

However, Adam was convicted of <u>attempted</u> aggravated assault. The State contends his conviction must be upheld if beyond a reasonable doubt he purposely and knowingly committed any act toward the commission of aggravated assault, section 45-4-103, MCA. The State had originally charged Adam with aggravated assault. It is a mystery why at the close of all the evidence, it moved the court for an order submitting to the jury the case against Adam on attempt, rather than aggravated assault. Undoubtedly, the State felt that it could not show serious bodily injury or

bodily injury from the use of a weapon, two of the elements that constitute aggravated assault. Section 45-5-202, MCA. The State must also have felt that it failed to establish in Scotty a reasonable apprehension of serious bodily injury from the use of the chain as a weapon. There is no proof in the record of what Scotty may have apprehended from Adam's use of the chain. If there was proof in this case of reasonable apprehension by Scotty beyond a reasonable doubt, the crime of aggravated assault, itself would have been proven and there would be no need for the State to change the charge to an attempt. The question becomes, can the State charge a crime of attempted aggravated assault, there being no proof of serious bodily injury from the use of a weapon, or reasonable apprehension on the part of the assaulted person of serious bodily injury from the use of the chain as a weapon?

There may be doubt that in the circumstances of this case that there can be such a crime as attempted aggravated assault. Our aggravated assault statute, section 45-5-202, MCA, combines former statutes that related to the crimes of assault and battery. Under the common law, battery was the unlawful infliction of physical harm upon a victim. An assault was the <u>attempt</u> to inflict serious physical harm upon a victim. Thus to some theorists, a charge of attempted aggravated assault would be an absurdity, a charge of an <u>attempt</u> <u>to</u> <u>attempt</u>. In California and Colorado, there is no such crime as attempted assault or attempted aggravated assault. In re James M. (Cal.App. 1973), 510 P.2d 33; People v. Gordon (Colo. 1972), 498 P.2d 431; Allen v. People (Colo. 1971), 485 P.2d 886, 888. In Oregon and in Florida, however, the crime of attempted aggravated assault is recognized.

State v. Wilson (Ore. 1959), 346 P.2d 115; Hall v. State (Fla. *App.* 1978), 354 So.2d 914. And see People v. O'Connell (1891), 14 N.Y.S. 485.

In Montana, it has been held that if a defendant pointed a gun at a victim which the defendant knew to be unloaded, and the victim was put into fear and alarm because the gun appeared to him to have the capacity to inflict physical harm, an assault (not an attempt) was committed. It is the object of the law to prevent such fear and alarm on the part of the person assaulted. State v. Herron (1892), 12 Mont. 230, 235, 29 P. 819, 821. There the defendant did not have the capacity to inflict physical harm upon the victim; yet the proof showed the apprehension of the victim. Missing in Adam's case is any proof of fear or apprehension on Scotty's part from the actions of Adam in this incident.

If it were to be conceded that in Montana a knowing or purposeful attempt by Adam to cast a chain at Scotty so as to cause him bodily injury, or to raise in Scotty a reasonable apprehension of serious bodily injury, would constitute the crime of attempted aggravated assault, the proof here still fails even in those respects.

Under the felony-murder rule, Adam's purpose and knowledge to commit felony-murder would be presumed if in committing an underlying felony involving the use or threat of force or violence, he caused the death of Scotty. Section 45-5-102, MCA. Here the State recognized during trial that the jury could not convict Adam of both the crime of aiding and abetting Arrow in the homicide and the crime of attempted aggravated assault. The District Court agreed. It instructed the jury that as to Adam, if he were to be convicted, it must be on one count or the other. The jury

- 22 -

failed to convict Adam on the count that he aided and abetted Arrow. In other words, the jury seems to have found that there was no common plan or design between Adam and Arrow to make Adam an accomplice, an aider or abettor under count one. We find as a matter of law that the evidence is insufficient to show a common plan or design between Adam and Arrow under count two. Since the evidence is insufficient to establish the underlying felony of attempted aggravated assault, Adam's purpose and knowledge may not be presumed as to the charge of felony-murder. There is no other proof than that which we have shown above in the record from which Adam's purpose and knowledge may be inferred in connection with his actions during the incident.

Further, in order for the felony-murder rule to apply, the State must prove that the underlying felony was the cause of Scotty's death. Adam's conduct can be the cause of Scotty's death only if without Adam's conduct the result would not have occurred. Section 45-2-201(a), MCA. Here again, the case against Adam fails completely. It is as compatible with the record to find that Arrow acted completely independently of Adam in firing the fatal shot.

We therefore conclude that the conviction of Adam Weinberger under the felony-murder rule for deliberate homicide cannot be sustained. We reverse the conviction of Adam and remand the cause to the District Court with instructions to dismiss the charges against Adam Weinberger.

_John C. Sheehy_
Justice

- 23 -

We Concur:

---

       Chief Justice

_John Conway Harrison_

---

---

---

       Justices

I join in the opinion reversing the conviction and ordering a dismissal. However, I have a separate concurring opinion which will follow shortly.

           _Daniel J. Shea_
                Justice

Mr. Chief Justice Frank I. Haswell, dissenting:

I would affirm Adam Weinberger's conviction of deliberate homicide in the killing of Floyd Azure.

The charge of which Adam Weinberger was convicted was Count II of the amended information. In pertinent part, the charge reads as follows:

> ". . . the defendant committed the offense of deliberate homicide . . . in that the death of Floyd Azure was caused while . . . the defendant, Adam Weinberger, was purposely and knowingly engaged in the attempted commission of the crime of aggravated assault, a felony, which involves the use or threat of physical force or violence upon Floyd Azure in violation of section 45-5-102(1)(b), MCA . . . "

Montana law defines deliberate homicide as criminal homicide "committed while the offender is engaged in . . . any . . . felony which involves the use or threat of physical force or violence against any individual." Section 45-5-102(1)(b), MCA.

Attempted aggravated assault is a felony under Montana statutes. A felony is defined as "an offense in which the sentence imposed upon conviction is death or imprisonment in the state prison for any term exceeding 1 year." Section 45-2-101(21), MCA. Aggravated assault is punishable by imprisonment in the state prison "for a term not less than 2 years or more than 20 years" plus a permissive fine of not more than $50,000. Section 45-5-202(2), MCA. An attempt is punishable "not to exceed the maximum provided for the offense attempted." Section 45-4-103(3), MCA.

In my view the record discloses substantial evidence that Adam Weinberger was engaged in attempted aggravated assault involving "the use or threat of physical force or

violence" against Floyd Azure when Arrow Weinberger shot Azure.

The facts set forth in the majority opinion demonstrate a conflict, if not an animosity, between the two Weinbergers on the one hand and the victim and his wife on the other over the developing relationship between the Azures' daughter and Adam Weinberger. These facts show an attempt by the parents to locate the Weinbergers and through them to ascertain the whereabouts of their daughter. They observed Adam on the Fort Kipp Road and attempted to follow him and stop him in a high speed chase but were unable to do so because Adam pulled into the passing lane and would not let them pass. Immediately thereafter, Adam was observed standing beside Arrow's car talking to him. The hitchhiker, Hanzlick, testified that Adam, after talking to Arrow, said there might be a fight.

The victim pulled into the gas station in Culbertson. Arrow and Adam followed him and blocked him in. Adam got out of his car and told the victim to get his bat as Adam crossed to the pickup and grabbed the logger's chain. Viewed in the light most favorable to the State, as we must when reviewing a conviction, the testimony of Rodney Azure indicates that Adam started swinging about three feet of doubled over chain "towards Scotty [the victim] I guess" but was prevented from hitting the victim by Rodney who was holding the other end of the chain. At that point Arrow Weinberger shot the victim in the heart area from a policeman's stance.

Following the shooting, Adam said, "What do you expect? They were tailgating us." In the deputy sheriff's car after the shooting, Adam said, "that's one and four to go" apparently referring to the victim and his four sons.

26

The Montana statute on attempts provides that "[a] person commits the offense of attempt when, with the purpose to commit a specific offense, he does any act toward the commission of such offense." Section 45-4-103(1), MCA. Adam's purpose to commit an aggravated assault is proven by circumstantial evidence, viz., the conflict between Adam and the victim over Adam's relationship with the victim's daughter, the actions of Adam and Arrow Weinberger in following the victim into the service station and blocking his car from leaving the service station, Adam's invitation to the victim to get out his bat, Adam's attempt to use the doubled up logging chain as a weapon against the victim, Adam's remark at the service station following the shooting, and his statement "that's one and four to go" in the deputy sheriff's vehicle.

The statutes defining aggravated assault as applied to this case provides:

> "A person commits the offense of aggravated assault if he purposely or knowingly causes:
>
> ". . .
>
> "(c) reasonable apprehension of serious bodily injury in another by the use of a weapon;" Section 45-5-202(1)(c), MCA.

The jury apparently considered that Adam purposely and knowingly caused a reasonable apprehension of serious bodily injury in the victim when Adam attempted to use a doubled up section of logging chain against the victim. The foregoing evidence is sufficient to establish a purposeful and knowing attempt by Adam to commit aggravated assault on the victim in my view. It is likewise sufficient to show Adam's acts toward the commission of an aggravated assault within the purview of the attempt statute.

27

The foregoing evidence is likewise sufficient to show that the victim met his death as a result of the conduct of both Adam and Arrow acting in concert within the meaning of State ex rel. Murphy v. McKinnon, quoted by the majority, and the guidelines set forth therein concerning the felony murder rule. The totality of the evidence in this case indicates to me a purposeful and knowing cold-blooded murder by Adam and Arrow acting in concert.

For the foregoing reasons I would affirm the verdict of the jury and the judgment entered thereon.

_____
Chief Justice

We concur in the foregoing dissent by the Chief Justice.

_____

_____
Justices